**KRYGOSKI CONSTRUCTION COMPANY, INC., Plaintiff–Appellee,**

v.

**The UNITED STATES, Defendant–Appellant.**

No. 95–5136.

United States Court of Appeals, Federal Circuit.

Aug. 1, 1996.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Nov. 7, 1996.

H. Robert Showers, Gammon & Grange, P.C., McLean, Virginia, argued, for plaintiff-appellee. With him on the brief was Peter F. Rathbun.

Sheryl L. Floyd, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., argued, for defendant-appellant. With her on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director. Of counsel was Arvis Freimuts, Assistant District Counsel, U.S. Army Corps of Engineers, Detroit, Michigan.

Before RICH, RADER, and BRYSON, Circuit Judges.

RADER, Circuit Judge.

The United States Court of Federal Claims determined that the United States Army Corps of Engineers (Corps) had no justification for terminating a demolition contract with Krygoski Construction Company, Inc. (Krygoski) for the Government's convenience. *Krygoski Constr. Co. v. United States*, No. 214–89C (Fed.Cl. March 2, 1993). To remedy the breach, the trial court awarded Krygoski $1,456,851.10 in damages plus interest pending payment. *Krygoski Constr. Co. v. United States*, No. 214–89C (Fed.Cl. May 19, 1995). Because the trial court incorrectly relied on *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756 (1982), this court reverses and remands.

## BACKGROUND

In 1985, the Corps undertook demolition of an abandoned U.S. Air Force airfield and missile site near Raco, Michigan. During surveys of the site, the Corps found asbestos contamination. Based on blueprints and its survey, the Corps estimated that two buildings at the site contained asbestos contamination in 1600 linear feet of pipe insulation and 650 square feet of tank and duct insulation. The survey also revealed that extensive vandalism may have spread asbestos debris on the floors of the buildings.

On August 12, 1985, the Corps issued an invitation for bids on the demolition project. The solicitation noted that bids should range between $500,000 and $1,000,000. Eight bidders bid on the contract. Krygoski won the contract with the low bid of $414,696. On or

about September 30, 1985, Krygoski and the United States through the Detroit District of the Army Corps of Engineers entered into Contract No. DACA35–85–C–0001. This contract required removal and disposal of the asbestos during restoration of the site. Seven line items in the contract specifically addressed asbestos abatement:

| | | Unit | Unit Price |
|---|---|---|---|
| 1. | Asbestos Pipe Insulation Removal and Disposal | | |
| | a. First 1600 Linear feet | 1600 L.F. | $10.98 |
| | b. Over 1600 Linear feet | 700 L.F. | $10.75 |
| 2. | Asbestos Tank and Duct Insulation Removal and Disposal | | |
| | a. First 650 Square feet | 650 S.F. | $ 8.90 |
| | b. Over 650 Square feet | 100 S.F. | $ 8.78 |
| 3. | Demolition, Removal and Disposal | 1 Job | $260,940.00 |
| 4. | Underground Tank Excavation and Backfill | | |
| | a. First 6700 Cubic Yards | 6700 C.Y. | $ 3.00 |
| | b. Over 6700 Cubic Yards | 3300 C.Y. | $ 2.00 |
| 5. | Fill | | |
| | a. First 12,000 Cubic Yards | 12,000 C.Y. | $ 2.50 |
| | b. Over 12,000 Cubic Yards | 5,000 C.Y. | $ 2.00 |
| 6. | Missile Silo Fill | 28 EA. | $1,000.00 |
| 7. | Topsoil, Seeding and Mulching | 39,000 S.Y. | $ .70 |

The contract contained a Variations in Estimated Quantities (VEQ) Clause for items 1, 2, 4, and 5 above:

Variation from the estimated quantity in the actual work performed under any second or subsequent sub-item ... will not be the basis for an adjustment in contract unit price.

This VEQ Clause anticipated variations in asbestos quantities for these four items at the Raco site. The VEQ Clause, however, did not contemplate quantity variations for asbestos removal in other areas.

Krygoski conducted a predemolition survey. Just ten days after Krygoski acknowledged receipt of the notice to proceed with the contract, Mr. Phillips, Krygoski's counsel, informed the Corps of asbestos in the vinyl flooring and roof insulation of the Raco buildings. Krygoski proposed to remove the tile for a unit price of $8.78 per square foot—the cost of removing additional duct insulation under item 2 of the VEQ Clause. The Corps requested Thermo Analytical, Inc. to take samples at potential new locations of asbestos contamination. The tests showed asbestos in the tile and the flashing at the Composite building, but not in the roof insulation.

From examining the drawings, the Corps' Area Office estimated asbestos removal needs at 36,340 square feet. At Krygoski's removal price of $8.78 per square foot, this amount of removal yielded an additional cost of about $320,000 for the floor tile. The Corps did not, however, actually test each tile. The Corps derived its estimate from the drawings.

The contracting officer, Lieutenant Colonel Phillip Johnson (LTC Johnson), considered a price increase of this dimension a cardinal change in the contract. LTC Johnson reached this conclusion because this increase exceeds 33% of the total contract cost. For a change of this magnitude, the Corps followed

a general policy of terminating the contract for the convenience of the Government and reprocuring the work competitively under the Competition in Contracting Act. LTC Johnson also considered that Krygoski had not started work on the contract. In fact, Krygoski had done little beyond transporting four pieces of equipment to the Raco site. In light of these circumstances, the Corps terminated the contract for the convenience of the Government on September 5, 1986.

Following the termination, the Corps resolicited bids for the Raco site demolition. The Corps revised its specifications to reflect the additional asbestos removal work as well as other changes. The Corps received eight offers on this new solicitation, DACA35–87–B–001. Krygoski was the sixth lowest bidder at $1,200,000. Anderson Excavating & Wrecking Co. (Anderson) won the bidding at $443,200. Due to modifications to the contract, the Corps eventually paid Anderson a total of $542,861.60 to complete the contract.

Krygoski sued in the Court of Federal Claims alleging that the Corps breached its original contract. Relying on *Torncello*, 681 F.2d at 772 (reading the termination for convenience clause to require some change in the circumstances of the bargain or in the expectations of the parties), the trial court found the Government improperly terminated Krygoski's contract. In the alternative, the trial court found the Government abused its discretion in terminating the contract under the *Kalvar* standard. *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977). Accordingly, the trial court awarded Krygoski $1,456,-851.20 in damages plus interest. This amount included anticipatory lost profits. The Government appeals.

### DISCUSSION

▮ This court reviews Court of Federal Claims decisions for errors of law and clearly erroneous findings of fact. *Cooper v. United States*, 827 F.2d 762, 763 (Fed.Cir.1987) (citing *Milmark Servs., Inc. v. United States*, 731 F.2d 855, 857 (Fed.Cir.1984)).

The trial court thoroughly analyzed the factual circumstances and legal principles of this case. Its careful work properly framed the issues for this appeal. As the trial court perceived, the case law governing the decision to terminate a contract for convenience has not always set a clear, unambiguous standard. *See Torncello*, 681 F.2d at 764–72 (recounting history of terminations for convenience). An examination of termination for convenience law from several decades ago discloses mixed signals about limiting terminations under the bad faith/abuse of discretion standard in *Kalvar*, 543 F.2d at 1301–06, or the change of circumstances test in *Torncello*, 681 F.2d at 772. A full review of more recent case law, coupled with recent enactments, however, discloses a clear signal for implementation of termination for convenience clauses.

### I.

At the outset, this court traces some of the history leading up to articulation of two tests for convenience terminations. The Government always possessed the power to terminate its contracts; such action, however, constituted a contract breach. John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 1073 (3d ed.1995) [hereinafter Cibinic & Nash]. Terminations for the Government's convenience developed as a tool to avoid enormous procurements upon completion of a war effort. Because public policy counselled against proceeding with wartime contracts after an end to hostilities, the Government, under certain circumstances, began to terminate contracts and settle with the contractor for partial performance. In 1863, the Army, for example, promulgated Rule 1179 in the Army Regulations concerning contracting for subsistence stores. Rule 1179 expressly "provide[d] for [subsistence contract] termination at such time as the Commissary–General may direct." *United States v. Speed*, 75 U.S. (8 Wall.) 77, 78, 19 L.Ed. 449 (1868). The Supreme Court has acknowledged the Government's authority to settle breach claims after a convenience termination. *Cf. United States v. Corliss–Steam Engine Co.*, 91 U.S. 321, 323, 23 L.Ed. 397 (1875) (finding the Navy Department had authority to suspend work under a contract and enter into a breach

settlement for partial performance); *see also* Cibinic & Nash, at 1073–74.

After World War I, the Government terminated contracts in large numbers. New statutory authority provided for settlement of the claims from those terminations. *See* Dent Act, 40 Stat. 1272 (1919). When World War II started, the Contract Settlement Act of 1944, 58 Stat. 649, provided further statutory and regulatory provisions for contract termination. *See* Cibinic & Nash, at 1074.

In 1964, the first edition of the Federal Procurement Regulation (FPR) included optional termination for convenience clauses. FPR 1–8.700–2. By 1967, the FPR required termination for convenience clauses in most procurement contracts. 32 Fed.Reg. 9683 (1967). Thus, termination for convenience—initially developed for war contracts—evolved into a principle for Government contracts of far-ranging varieties, both civilian and military. *See* 48 C.F.R. § 49.502 (1995). The exigencies of war no longer limited the Government's ability to terminate a contract for convenience. Although wartime situations no longer limit use of the practice, the Government's authority to invoke a termination for convenience has, nonetheless, retained limits. A contracting officer may not terminate for convenience in bad faith, for example, simply to acquire a better bargain from another source. *Torncello*, 681 F.2d at 772. When tainted by bad faith or an abuse of contracting discretion, a termination for convenience causes a contract breach. *See Allied Materials & Equip. Co. v. United States*, 215 Ct.Cl. 902, 905–06, 1977 WL 9596 (1977); *National Factors, Inc. v. United States*, 204 Ct.Cl. 98, 492 F.2d 1383, 1385 (1974); *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974); *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 325 F.2d 438, 442 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964).

The contractor's burden to prove the Government acted in bad faith, however, is very weighty. *Kalvar*, 543 F.2d at 1301 ("Any analysis of a question of Governmental bad faith must begin with the presumption that public officials act 'conscientiously in the discharge of their duties.'" (quoting *Librach*

*v. United States*, 147 Ct.Cl. 605, 612 (1959))). Due to this heavy burden of proof, contractors have rarely succeeded in demonstrating the Government's bad faith. *See* Cibinic & Nash, at 1078; *Kalvar*, 543 F.2d at 1301; *Librach*, 147 Ct.Cl. at 612.

## II.

In 1982, this court's predecessor articulated in dicta another test for the sufficiency of convenience terminations. *Torncello*, 681 F.2d at 758. In *Torncello*, the Navy awarded a requirements contract, but then purchased some work covered by the contract from a competing bidder at a lower price. *Id.* In an earlier case, *Colonial Metals Co. v. United States*, 204 Ct.Cl. 320, 494 F.2d 1355 (1974), the Court of Claims had allowed a termination for convenience under these circumstances. In *Colonial Metals*, the Navy terminated a contract for copper ingot solely to obtain a better price. In fact, the Navy knew of the better price at the time of contract award. The Court of Claims permitted this termination because "such a motive [contracting for a lower price elsewhere] is not improper." 494 F.2d at 1359.

*Torncello* offered the opportunity to revisit and overrule the *Colonial Metals* case. Indeed *Colonial Metals* was inconsistent with the *Kalvar* bad faith limit on terminations for convenience. Even factoring in *Kalvar*'s presumption of good faith actions by public officials, 543 F.2d at 1301, the Navy in *Colonial Metals* contracted in bad faith. At the time of award, the Navy knew of the better price it later terminated the contract to obtain.

In *Torncello*, the Navy—knowing it could acquire the same services at a lower price from another contractor—again contracted with Torncello and Soledad Enterprises in an exclusive requirements contract. The Navy then began satisfying its requirements from that cheaper source. Torncello claimed the Navy breached the requirements contract. The Armed Services Board of Contract Appeals found the contract constructively terminated for the Government's convenience, disallowing Torncello contract breach damages. This court's predecessor overruled *Colonial*

*Metals* because the Navy used the termination for convenience clause to escape a promise it never had an intention to keep. *Torncello,* 681 F.2d at 772. Indeed, then Chief Judge Friedman concurred with that narrow understanding of the court's action:

> As I understand the court's opinion, the court holds only that when the government enters into a requirements contract, knowing that it can obtain an item the contract covers for less than the contract price and intending to do so, there cannot be a constructive termination for convenience of the government when the government follows that course. On that basis, I join in the opinion.

*Id.* at 773;[1] *see also Salsbury Indus. v. United States,* 905 F.2d 1518, 1521 (Fed.Cir. 1990), *cert. denied,* 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 664 (1991) (construing the *Torncello* holding).

Despite the adequate justification to overrule *Colonial Metals* under the existing *Kalvar* test, a plurality of judges in *Torncello* proceeded to articulate in dicta a broader test for gauging the sufficiency of a convenience termination. The plurality stated that the Navy could not invoke a convenience termination unless some change in circumstances between the time of award of the contract and the time of termination justified

the action. *Torncello,* 681 F.2d at 772. As in this case, trial courts and boards have occasionally vacillated between applying the long-standing *Kalvar* test or the *Torncello* test.[2]

### III.

Recent enactments, however, have underscored rules of Government contracting which render the plurality's dicta in *Torncello* inapplicable to the present regime of contract administration. Recent statutes fully address the concerns of the *Torncello* plurality regarding the Government's shopping for lower prices after contract award. The Competition in Contracting Act (CICA), Pub.L. No. 98–369, 98 Stat. 1175 (codified as amended in scattered sections of 10, 31 and 41 U.S.C.), compels the promulgation of regulations and procedures to ensure full and open competition. *See* 41 U.S.C. §§ 401, 405(a) and 416 (1994).

In 1984, CICA articulated significant factors addressing a contracting officer's decision to terminate a contract for the Government's convenience. CICA requires executive agencies, when procuring property or services, to "obtain full and open competition through use of competitive procedures." 41 U.S.C. § 253(a)(1)(A)

---

**1.** Six judges participated in the en banc *Torncello* opinion. A plurality of three judges joined the reasoning that postulated a broad alternative "change of circumstances" test for convenience terminations. The remaining three judges, then Chief Judge Friedman and Circuit Judges Davis and Nichols, each concurred separately under much narrower reasoning. Judge Davis stated: "I do not agree that 'abuse of discretion' is an inadequate or unsatisfactory general standard for gauging the contracting officer's use of the termination clause." *Torncello,* 681 F.2d at 773. Judge Nichols agreed: "Moreover, a termination of a contract for convenience is valid only in the absence of bad faith or a clear abuse of discretion." *Id.* at 774 (citations omitted). Judges Davis and Nichols expressly condemned the plurality's opinion as "unnecessarily broad," *id.* at 773, "needlessly circuitous," *id.* at 774, and "needlessly sweeping," *id.* Indeed, then Chief Judge Friedman's terse concurrence (stated in its entirety above) carries a similar silent condemnation.

**2.** *See Sneeden v. United States,* 33 Fed.Cl. 303, 310–11 (1995) (utilizing the *Kalvar* test); *Conti-*

nental Collection & Disposal, Inc. v. United States, 29 Fed.Cl. 644, 652–53 (1993) (applying the bad faith/abuse of discretion standard citing both *Torncello* and *Kalvar* ); *Nationwide Roofing & Sheet Metal Co. v. United States,* 14 Cl.Ct. 733, 735–37 (1988) (implementing both the *Torncello* and the *Kalvar* tests); *Maxima Corp. v. United States,* 847 F.2d 1549 (Fed.Cir.1988) (employing the *Torncello* Test). In *Maxima,* the Government invoked a constructive termination for convenience, a year after contract performance. The Government had ordered the contractor, Maxima, to refund payments that had been made under the contract. The Board of Contract Appeals of the Department of Interior held the Government's actions were proper. This court reversed, citing, in part, *Torncello.* The facts in *Maxima* fit within the narrow circumstances of *Torncello.* In *Maxima,* the Government purported to honor its contract, only to profess a year after contract completion that it had terminated that contract. Thus, *Maxima* stands for the proposition the Government cannot retroactively create a breach in order to change the Government's obligations under a completed contract. 847 F.2d at 1553–54.

(1994). Thus, CICA ensures that contracting officers receive bids at competitively low prices. For each solicitation, a contracting officer must maintain full and open competition in the procurement process, unless one of the limited exceptions applies. *See* 10 U.S.C. § 2304 (1994). CICA mandates impartial, fair, and equitable treatment for each contractor. *See* 10 U.S.C. §§ 2304 and 2305 (1994).

■ This competitive fairness requirement, with its bid protest remedies, restrains a contracting officer's contract administration. If, for instance, a contracting officer discovers that the bid specifications inadequately describe the contract work, regulations promulgated under CICA may compel a new bid. *See* 10 U.S.C. § 2305; 48 C.F.R. § 1.602–2. Thus, to accommodate CICA's fairness requirements, the contracting officer may need to terminate a contract for the Government's convenience to further full and open competition. 48 C.F.R. §§ 1.602–2(b); *see* 41 U.S.C. § 414 (1994). Thus, to further its full competition objective, CICA permits a lenient convenience termination standard.

■ Not every necessary alteration of the contract scope, however, requires a new bid procedure. *See* 41 U.S.C. §§ 423(e)(1), 423(e)(2) (1994) (providing procedures for certifications before a contract modification or extension). Only "modifications outside the scope of the original competed contract fall under the statutory competition requirement." *AT & T Communications, Inc. v. WilTel, Inc.,* 1 F.3d 1201, 1205 (Fed.Cir. 1993). CICA does not fully define a "standard for determining when modification of an existing contract requires new competition or falls within the scope of the original competitive procurement." *Id.* This court, nonetheless, has stated that a "cardinal change" is a drastic modification beyond the scope of the contract:

> Under established case law, a cardinal change is a breach. It occurs when the government effects an alteration in the work so drastic that it effectively requires

the contractor to perform duties materially different from those originally bargained for. By definition, then a cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach.

*Id.* (citing *Allied Materials & Equip. Co. v. United States,* 215 Ct.Cl. 406, 569 F.2d 562, 563–64 (1978)); *see also Air–A–Plane Corp. v. United States,* 187 Ct.Cl. 269, 408 F.2d 1030, 1032–33 (1969). In *WilTel,* the question was not whether the Government modifications breached a contract, but was "whether Government modifications changed the contract enough to circumvent the statutory requirement of competition." 1 F.3d at 1205. In other words, the court inquired whether the modification was within the scope of the competition for the original contract. *Id.*

## IV.

In the wake of CICA, with its protections for competition, this court has revisited the dicta in the *Torncello* plurality opinion. *Salsbury,* 905 F.2d at 1518. In *Salsbury,* a district court determined that the Postal Service had wrongfully eliminated a bidder from the procurement process which granted Salsbury Industries the contract. Under the court order, the Postal Service suspended work on Salsbury's contract and subsequently terminated the contract for convenience. Recognizing the role of convenience terminations in the CICA regime, this court stated that "[i]t is not the province of the courts to decide *de novo* whether termination was the best course. 'In the absence of bad faith or clear abuse of discretion the contracting officer's election to terminate is conclusive.'" *Id.* at 1521. (quoting *John Reiner,* 325 F.2d at 442). With this guidance, this court applied the standards of *Keco* to test the arbitrariness of the termination decision.[3]

This court also directly addressed the applicability of the *Torncello* plurality opinion:

> [*Torncello* ] stands for the unremarkable proposition that when the government contracts with a party knowing full well that it

---

**3.** The Court of Claims enumerated four factors to apply in determining whether contracting officers abused their discretion: (1) the procurement official's bad faith, (2) the reasonableness of the decision, (3) amount of discretion delegated to the procurement official; and (4) violations of an applicable statute or regulation alone may be arbitrary.

will not honor the contract, it cannot avoid a breach claim by adverting to the convenience termination clause.

*Id.* Thus, this court rejected the reasoning of the *Torncello* plurality.

Again, more recently, this court has confronted an invitation to apply the reasoning and test of the *Torncello* plurality. *Caldwell & Santmyer, Inc. v. Glickman,* 55 F.3d 1578 (Fed.Cir.1995). In *Caldwell,* the Department of Agriculture's Animal and Plant Health Inspection Service (APHIS) solicited bids for the construction of its Plant Germplasm Quarantine Laboratory in Beltsville, Maryland. The solicitation's specifications included an ambiguous term. *Caldwell,* 55 F.3d at 1580. The lowest bidder withdrew its bid when it discovered the ambiguity about some costs APHIS expected the contractor to bear. Caldwell received a routine preaward letter. *Id.* At that point, APHIS discovered that Caldwell had also interpreted the ambiguous specification differently from the Government. Because the ambiguity impeded full and open competition, APHIS terminated Caldwell's contract for the Government's convenience. *Id.* Without corrective action, performance of the contract would prejudice the other bidders. This court recited again the passage from *Salsbury* that interpreted *Torncello* in consonance with the opinions of then Chief Judge Friedman and Judges Davis and Nichols. Moreover, this court underscored that assessment: "*Salsbury* teaches that bad faith ... is a prerequisite for a *Torncello* claim." *Id.* at 1582.

In sum, on two recent occasions after enactment of CICA, this court has expressly repeated the narrow applicability of *Torncello. Id.* at 1582; *Salsbury,* 905 F.2d at 1521. Indeed this court's recent pronouncements are fully consistent with the policy goals of CICA and other Government procurement statutes. Under these policies, contracting officers have no incentive to terminate a contract for convenience except to maintain full and open competition under CICA. With an adequate contractor in place, the contracting officer has no interest to reprocure. Moreover, where an officer must choose between modifying or terminating a contract, ease of administration usually imparts a bias in favor of modification. Thus *Salsbury* and *Caldwell* suggest that this court will avoid a finding of abused discretion when the facts support a reasonable inference that the contracting officer terminated for convenience in furtherance of statutory requirements for full and open competition.

## V.

■ Turning now to this case, the termination for convenience clause of the contract provided:

> The Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest.

*See* 48 C.F.R. § 52.249–2 (1995). This contract language governs the legal relations of the parties. Under the discretion conferred by this contract language, Contracting Officer LTC Johnson decided to terminate the contract with Krygoski because removing the asbestos-containing vinyl tile would constitute a cardinal change from the originally competed contract. The contracting officer felt that a change increasing the total contract price between 25% and 33% warranted resolicitation. The trial court stated that LTC Johnson cited "no authority for his definition of cardinal change." Because the Government ultimately removed only 9,000 square feet of tile, not 36,000 square feet, the trial court concluded that the Corps arbitrarily and capriciously miscalculated the scope of asbestos abatement. To the contrary, the contracting officer had a reasonable basis for terminating the contract for the Government's convenience. Asbestos removal was originally estimated to cost about $40,000 out of an estimated $415,000 demolition contract. Thus asbestos removal accounted for about 10% of the total cost of the contract. At that point, the contracting officer's experts increased the cost of asbestos removal by about $320,000. After this change, the total asbestos removal cost was about $360,000 on a contract near $775,000— just under 50% of the total contract. Asbestos removal, originally about 10%, became about 50% of the contract work.

Under these circumstances, the contracting officer had ample justification for conducting a reprocurement competitively under CICA. With this change in the scope of contract work, different bidders, like asbestos removal firms, may have entered the competition on the contract. *See* 48 C.F.R. §§ 14.203–1, 14.203–2 (1995) (enumerating the methods of soliciting bids where invitations for bids or presolicitation notices are mailed to prospective bidders or are displayed in public places, like trade journals).

In determining whether a modification falls within CICA's competition requirement, this court in *WilTel* examined whether the contract as modified materially departs from the scope of the original procurement. *WilTel,* 1 F.3d at 1205. In this case, the contracting officer, LTC Johnson, determined that the removal of the asbestos-contaminated floor tile amounted to a cardinal change, a modification outside the scope of the original competed contract. The contract has no provision to increase the cost of the contract under the VEQ Clause for removal of asbestos-contaminated floor tile. In fact, if the removal of floor tile was within the scope of the contract, Krygoski may have the obligation to remove the tile without increasing the contract price. The contracting officer, recognizing the equities of this situation, terminated the contract for convenience to comply with CICA.

The trial court erred by invoking and relying upon the *Torncello* plurality test. The trial court improperly found no change of circumstances sufficient to justify terminating the contract for the Government's convenience. Although arguably the Government's circumstances had sufficiently changed to meet even the *Torncello* plurality standard, this court declines to reach this issue because *Torncello* applies only when the Government enters a contract with no intention of fulfilling its promises. *Salsbury,* 905 F.2d at 1521.

LTC Johnson's decision to terminate is analogous to that made in *Caldwell.* LTC Johnson terminated the contract to preserve full and open competition. He decided to avoid any prospect of prejudice to other bidders. Unlike the *Torncello* situation, this record shows no evidence that the Corps intended from the outset to void its promises. Thus, *Torncello* does not apply. Accordingly, this court finds that LTC Johnson did not abuse his discretion, act arbitrarily or capriciously or in bad faith in terminating the contract for the Government's convenience.

This court reverses and remands for termination for convenience damages which are to include costs of performance prior to termination, profits on that performance and termination costs. No anticipatory profits are to be awarded. Reversed and remanded to calculate these costs.

### COSTS

Each party shall bear its own costs.

*REVERSED AND REMANDED.*