**NORTHROP GRUMMAN CORP., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 97–359C.

United States Court of Federal Claims.

April 7, 2000.

J. William Eshelman, Michael C. Poliner, Douglas J. Feith, & J. Michael Littlejohn, Feith & Zell, P.C., Washington, D.C., for plaintiff.

Shalom Brilliant & Aileen Bell, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

HODGES, Judge.

Northrop Grumman was one of four contractors chosen by the National Aeronautics and Space Administration to construct a Space Station for NASA. It turned out that having four prime contractors working on a project of this nature was not an efficient way to proceed. As a result, Congress and the Administration were becoming disenchanted with the program. NASA feared that the entire project would be lost if the

contractors' management structure and contractual relationships were not adjusted. NASA proposed that one of the four contractors should become the single prime contractor, and that the other three would be "novated" as subcontractors to the single prime.

NASA Administrator Daniel Goldin met with the chief executive officers of the four corporations and expressed his concern that the entire project could be lost unless everyone cooperated. It is fair to say that the CEO's were acquiescent to the single prime proposal, if not approving. Perhaps some reserved judgment, but no substantial objection was raised to the Administrator's proposal at the time.

Boeing was chosen by NASA as the prime contractor. Grumman was given substantially less work under the new scaled-down program by Boeing than it had hoped and expected. In connection with the reorganization, the United States terminated Grumman's contract for the convenience of the Government. Plaintiff believes that its SSEIC contract [1] was terminated for convenience in bad faith and that a "CEO Agreement" that arose from the CEO meeting contained a promise that Grumman would be no worse off under the new Boeing regime than before. According to Grumman, this created a contract with the United States that it breached when Grumman had far fewer responsibilities after Boeing took over as prime.

Plaintiff's primary causes of action therefore are bad faith termination for convenience and breach of contract. Assuming that all of plaintiff's material allegations are true, we must nevertheless grant defendant's motion for summary judgment.

## BACKGROUND

The United States began working on the Space Station Program in 1984. The National Aeronautics and Space Administration awarded "work package" contracts to design, develop, test, and build parts of the Space Station. These contracts were awarded to Boeing, McDonnell Douglas, and Rockwell International. NASA served as overall coor-

1. SSEIC stands for the Space Station Engineering and Integration Contract.

dinator, but largely delegated responsibilities for coordination to plaintiff Northrop Grumman. Grumman was awarded a contract for program support responsibilities in July 1987. Its role under the contract expanded two years later to include program-wide integration. The amended contract was known as the Space Station Engineering and Integration Contract (SSEIC).

NASA's decentralized construction plan led to significant cost overruns and schedule slippages. As a result, Members of Congress and the President of the United States expressed concern. NASA responded to these concerns by developing a Station Redesign Team to streamline the process. The SRT recommended that NASA designate *one* prime contractor responsible for managing, integration, and hardware development.

The White House supported the restructured Space Station Program. To implement the single prime plan, NASA Administrator Daniel Goldin met with Chief Executive Officers of the four contractors. Dr. Goldin advised the CEO's that NASA was considering changing the contractors' roles in the Space Station Program. Specifically, NASA would select a prime contractor without formal competition. The prime would be given overall responsibility for the project. The remaining contractors would be "novated" and reassigned to the selected prime. Goldin emphasized that the contractors were a team whose goal was keeping the project alive. He stated that he was "trying to keep things level," but that he could not keep all the contractors whole.

NASA selected Boeing as prime contractor in August 1993. Six days later, Goldin signed a written Determination and Finding that was submitted to Congress stating that it was "in the public interest to use other than full and open competition to make Boeing the single prime contractor for the Space Station...."

NASA provided plaintiff with a draft novation agreement, but plaintiff's officers expressed dissatisfaction that the draft did not contain any assurance concerning its role or scope of work in the Space Station Program. Boeing and Grumman representatives met to discuss Grumman's role as a subcontractor to

Boeing under the redesigned Space Station Program. Boeing proposed a reduction of integration tasks that included an overall reduction in employees from 735 to 399. This proposal was approved by NASA. Grumman's role called for 60 employees; while Boeing would provide 206. The remainder would be provided by the other contractors. Plaintiff expressed the view that reduction of its space station workforce to 60 "would effectively terminate [its] contract...." Grumman's CEO met with Administrator Goldin to discuss this concern in September 1993. NASA informed Grumman that it would handle all such matters through the normal contract administration process.

The contracting officer determined in October 1993 that it was in NASA's best interest to terminate plaintiff's SSEIC contract for the convenience of the Government. The contracting officer sent Grumman a notice of termination in November.

## DISCUSSION

The first count of plaintiff's complaint alleges that the July 1993 meeting NASA Administrator Goldin and the four Chief Executive Officers resulted in an implied-in-fact contract with Grumman that it terms the "CEO Agreement." Count two alleges that defendant's decision to terminate Grumman's SSEIC contract for convenience was made in bad faith.

### I

■ The elements of an implied-in-fact contract with the Government are (1) mutuality of intent to contract; (2) consideration; and (3) lack of ambiguity in offer and acceptance. *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990) (citing *Russell Corp. v. United States,* 210 Ct.Cl. 596, 537 F.2d 474, 482 (1976)). The government representative who enters into the contract on the Government's behalf must have actual authority to bind the United States. *City of El Centro,* 922 F.2d at 820. Plaintiff has not shown that any element was present in the "CEO Agreement" other than authority.

■ For example, consideration is one of the elements of a contract with the Govern-

ment. This court has held that consideration "must render a benefit to the government, and not merely a detriment to the contractor. Furthermore, government officials are without authority to make a contract for which the government receives no benefit or consideration." *Montefiore Hospital Ass'n of Western Pennsylvania. v. United States,* 5 Cl.Ct. 471, 476 (1984) (citing *Vulcanite Portland Cement Co. v. United States,* 74 Ct.Cl. 692, 705 (1931)).

Plaintiff contends that its consideration for the contract with NASA was agreeing to forbear lobbying Congress in opposition to the restructured Space Station Program. In exchange, Grumman would "continue to do the SSEIC work for the new prime." Specifically, plaintiff states that NASA

> perceived serious risks to the sole-source procedure unless it obtained the contractors' cooperation. That is why the Administrator convened the CEO meeting. And because of the CEO meeting, NASA succeeded in obtaining the cooperation it sought.

Grumman also claims that NASA benefitted by "putting the risk of litigation off to a later date and a different government agency."

■ A decision to forbear bringing a meritorious claim may create valid consideration. RESTATEMENT (SECOND) OF CONTRACTS § 90(1). But we are not aware of authority supporting the notion that agreeing not to lobby Congress is a benefit to the Government.[2]

■ NASA was not required to obtain consent of the contractors or of Congress to make a noncompetitive selection of a single prime contractor pursuant to 10 U.S.C. 2304(c)(7). Section 2304(c)(7) states:

> (c) The head of an agency may use procedures other than competitive procedures only when—
> (7) the head of an agency—

(A) determines that it is necessary in the public interest to use procedures other than competitive procedures in the particular procurement concerned, and

(B) notifies the Congress in writing of such determination not less than 30 days before the award of the contract.

Grumman could have lobbied Congress in opposition to the sole-source selection and the scaled-down Space Station Program, but we do not know how this may have affected the overall Program. Grumman may have lost everything.

Plaintiff cites an internal pre-CEO meeting briefing slide commenting on the sole source procedure as evidence of NASA's fear that contractors could lobby Congress in opposition to the sole-source selection procedure. It stated, "Carries Risk—Companies Left Out Could Lobby Congress." Plaintiff contends that this and similar statements, coupled with the fact that NASA was concerned about losing the entire program, constitute valid consideration. Such statements do not establish that *plaintiff* agreed not to lobby Congress however, even if it were valid consideration.[3] They evidence nothing more than NASA's acknowledgment that a risk to sole-source selection could be present.[4]

Plaintiff argues that it had a legal right to sue defendant for the Government's decision to select a prime contractor via the noncompetitive bidding process. If so, plaintiff's voluntary decision not to take legal action was not valuable consideration because no valid claim existed. NASA's decision to select a prime contractor by the non-competitive bidding process is non-reviewable. *See Varicon International v. Office of Personnel Management,* 934 F.Supp. 440, 443–44 (D.D.C.1996).

Plaintiff complains that the *Varicon* decision "had not been issued when the parties in the instant case met in the summer of 1993 ... the parties had a good faith belief when

2. Such an agreement could raise public policy concerns if it were valuable consideration.

3. Grumman's CEO, when asked whether he provided written assurances at the CEO meeting, testified, "I also didn't promise anything at that meeting." This is consistent with Administrator Goldin's testimony: "We didn't have CEO's talk-

ing about specific contract issues. That was not a contractual meeting."

4. In fact, plaintiff did lobby Congress after the July 1993 meeting regarding its diminished role in the Space Station Program.

they entered into the CEO Agreement that NASA was exposed to a litigation threat." First, we do not agree that anyone entered into a CEO Agreement if that term suggests a contract. Second, the *statute* gives an agency head complete discretion. *Varicon* merely confirmed the plain meaning of the statute. Even if plaintiff had agreed not to lobby Congress or to bring a lawsuit in opposition to the sole-source procedure, those agreements did not benefit the Government.

Plaintiff cites the following statement as evidence of its promise to forbear legal action against NASA: A NASA News Bulletin asking whether NASA anticipated actions from losers (legal actions or protests). The answer stated, "[b]ased on discussions between NASA Administrator and the Corporate CEO's, we do not anticipate legal actions challenging this selection." This statement evidences nothing more than NASA's concerns about the possibility of legal action. Plaintiff did not agree to give up a legal right, so such statements cannot be a basis for valid consideration.

Plaintiff contends that its not filing a lawsuit was beneficial because a lawsuit would have wasted resources. If we adopted plaintiff's reasoning in this regard, the mere threat of filing a lawsuit would always constitute consideration. We cannot say that plaintiff provided a benefit to defendant by not filing a suit that was unlikely to prevail.

During the course of several hearings prior to defendant's dispositive motion, we asked that plaintiff provide evidence that the "CEO Agreement"[5] was a government contract. Plaintiff relied on statements made by Administrator Goldin in the CEO meeting such as, we live in a "glass house" and the whole program could be lost if the contractors threw stones. Dr. Goldin stated that there would be "no winners or losers;" everyone would be a "winner;" this was NASA's "team." He said that the contractors not chosen as the prime contractor would be "novated" to the prime. The CEO meeting was an opportunity for the Administrator to inform contractors of NASA's reorganization plan for a single prime. Goldin wanted the contractors on board for the scaled-down

project, and he wanted their cooperation in the effort. Such comments do not create an implied-in-fact contract.

Grumman's Vice President took notes at the CEO meeting. These notes include statements such as "contracts will be renegotiated with the prime," and "some of you will get less, some will get more." Mr. Blyseth's notes state that Grumman's CEO, Dr. Caporali, told Administrator Goldin on his way out of the meeting that the "essence was in the details ... we can't agree to something we don't know." Dr. Caporali testified during a deposition that he understood "everyone might not come out with exactly the same job or the same share, but everybody's in it." Dr. Caporali stated that Dr. Goldin "did not spell out anything specific." Dr. Goldin testified in his deposition that the CEO meeting, "was not a contractual meeting." He wanted to "get a sense of what [the contractors] wanted to do and what directions they wanted to go in." None of these comments by either party suggest the possibility that an implied-in-fact contract was created between NASA and Grumman as a result of the CEO meeting.

## II

The second count of plaintiff's complaint alleges that the Government's decision to terminate Grumman's SSEIC contract was made in bad faith. Defendant contends that plaintiff's contract was terminated properly pursuant to the Termination for Convenience clause.

■■■ The Government's right to terminate a contract for convenience is broad. *See John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 390, 325 F.2d 438, 442 (1963) ("in the absence of bad faith or clear abuse of discretion the contracting officer's election to terminate is conclusive.") The Federal Circuit has stated that a contractor's burden to prove that the Government acted in bad faith is "weighty." *Krygoski Construction Company, Inc. v. United States*, 94 F.3d 1537, 1541 (Fed.Cir.1996). Government officials are presumed to act in good faith. *Kalvar*

---

5. This is plaintiff's term.

*Corporation, Inc. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298 (1976).

The Federal Circuit acknowledged in *Krygoski* that the history of termination for convenience law has "disclose[d] mixed signals about limiting terminations under the bad faith/abuse of discretion standard...." *Krygoski,* 94 F.3d at 1540. It added, however, that more recent case law has established "a clear signal for implementation of termination for convenient clauses." *Id.*

▪ This clear signal suggests two tests for determining whether a termination for convenience is improper: "A contracting officer may not terminate for convenience in bad faith, for example, simply to acquire a better bargain from another source." *Id.* at 1541 (citing *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 772 (1982)). This bad faith test is broader than the *Torncello* holding because of the phrase "for example." The court adds, "[w]hen tainted by bad faith *or* an abuse of contracting discretion, a termination for convenience causes a contract breach." *Krygoski,* 94 F.3d at 1541 (emphasis added). The second test is "when the Government enters a contract with no intention of fulfilling its promises." *Id.* at 1545 (citing *Salsbury Indus. v. United States,* 905 F.2d 1518, 1521 (Fed.Cir.1990)). The *Krygoski* court rejected another principle of *Torncello* that it considered to be dicta. This principle was that a contracting officer could not terminate for convenience unless he could establish a change in circumstances between the time of award and the time of contract. *Torncello,* 681 F.2d at 772.

▪ A contractor can turn a termination for convenience into a breach of contract by showing that the contracting officer abused his discretion or acted in bad faith, or entered into a contract with no intention of fulfilling its promises. The latter may be just another form of bad faith. The Circuit cautioned that a contractor has a burden of proof that is "weighty" in showing that the Government acted in bad faith, and that government officials are presumed to have acted in good faith. "Due to this heavy burden of proof, contractors have rarely succeeded in demonstrating the Government's bad faith." *Krygoski,* 94 F.3d at 1541.

▪ In our case, the contracting officer terminated Grumman's contract in accordance with the Termination for Convenience clause in its contract. That clause states:

(a) The Government may terminate performance of work under this contract in whole or, from time to time, in part, if—

(1) the contracting officer determines that a termination is in the Government's interest....

FAR § 52.249–6(a)(1). The Government did not enter a contract with no intention of fulfilling its promises. Plaintiff's SSEIC contract was in force for a period of time, then expanded. Even under the "plurality's dicta" of *Torncello,*[6] this contract termination would have survived because circumstances changed dramatically from the time of contracting to the time of termination. So the issue is whether the contracting officer acted in bad faith or abused his discretion in terminating this contract for convenience. Perhaps, for example, "simply to acquire a better bargain from another source." *Krygoski,* 94 F.3d at 1541.

The Government did not terminate this contract for convenience "simply" to acquire a better bargain from another source, even if that may have been the result. Plaintiff asks us to consider whether the Government acted in bad faith, however, so we must review its actions for a determination of motive and intent in this context. NASA wanted to save the Space Station. It was in serious jeopardy politically. Everyone knew that a reorganization was needed, including plaintiff.[7] The four-prime system was not working.

NASA's motivation was to save the program, not specifically to replace Grumman with Boeing. It was not seeking "simply" to remove plaintiff from this program and to

---

6. This is the term used by the Federal Circuit in *Krygoski.* 94 F.3d at 1542.

7. Dr. Caporali testified that "the people involved in the program—recommended that this be put under a prime because of the managerial mess ... [s]o this was not proceeding in a way diametrically opposed from what we thought ought to happen."

replace it with Boeing; it was implementing the plan that was described during the CEO meeting with Dr. Goldin. The entire Program was being scaled down. The Contracting Officer testified that he did not receive any direction concerning the determination to terminate the SSEIC contract. The result was negative for plaintiff as it turned out but plaintiff cannot show that such was the intent of the Government.

The remaining issue is whether the Federal Circuit in *Krygoski* intended to leave open the possibility of other examples of bad faith or abuse of discretion in a termination for convenience setting. It specifically disapproved of an intent "to acquire a better bargain from another source." *Id.* at 1541. Its use of the phrase "for example" suggests that other bad faith determinations would be illegal as well.

Plaintiff makes a number of rather troubling allegations to support a broader bad faith argument. We accept these allegations as true for the purposes of this motion, as we must. They are listed in plaintiff's materials. We do not address them here except to describe them generally as examples of prior knowledge by government officials of reduced Grumman duties under the new regime, and efforts to keep such information secret. If these allegations are true, they are not material. They may cast a negative light on the manner in which some government officials carried out their duties, but do not establish bad faith or abuse of discretion.

Everyone's intent in this case was to save the space program. That purpose was paramount at NASA and among the contractors as well. They wanted the program to proceed and succeed. Everything that NASA did was in furtherance of this goal. We have seen no evidence that NASA had reason to treat Grumman differently from anyone else, or to squeeze it from the program in bad faith or by abuse of discretion. Plaintiffs have not offered a reason why the Government would do such a thing. Grumman has been a reliable, long-time partner with the Government in supplying the defense needs and capabilities of this country. Such a showing is not plaintiff's burden, but it must present examples of bad faith or abuse of

discretion that are both material and genuine to avoid summary judgment. They have not done so in this case, and we must grant defendant's motion.

## CONCLUSION

The "CEO Agreement" did not produce a contract between or among anyone present. That meeting was an effort by NASA to save a crucial government initiative that was in jeopardy. Everyone at the meeting knew the stakes. Dr. Goldin said in essence, we've got to do something, or we all lose. You lose your contracts; we lose the Space Station. The CEO's understood the political reality, and they were acquiescent. It is difficult to imagine a scenario in which an implied-in-fact contract could have arisen. Dr. Goldin had authority to enter into a contract on behalf of the United States, but the other elements of a government contract could not have existed in these circumstances.

The termination for convenience issue is more complex. One approach would be to deny summary judgment and schedule a trial on the motives of various contracting officers and other government officials including the Administrator of NASA, Dr. Goldin. We do not consider this to be a proper use of judicial resources, however. Accepting plaintiff's material allegations as true, a court could not find that anyone acting with authority on behalf of the United States did so in bad faith.

Defendant's motion for summary judgment is GRANTED. The Clerk will dismiss plaintiff's complaint. No costs.