# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Tristana R. Harvey Career Planning & Consulting Series LLC | ) ASBCA No. 60927 |
| | ) |
| Under Contract No. W56ZTN-14-P-0033 | ) |

APPEARANCE FOR THE APPELLANT: Dr. Tristana R. Harvey
Owner

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
Army Chief Trial Attorney
MAJ Christopher M. Coy, JA
Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE SWEET

Tristana R. Harvey Career Planning & Consulting Series LLC (Harvey) appeals the decision of the United States Army Garrison-Aberdeen Proving Ground (Garrison) denying its settlement proposal following a termination for convenience. Harvey has elected to use the Board's expedited procedure pursuant to Board Rule 12.3. A one-day hearing was held on 31 May 2017, and both entitlement and quantum are at issue. The appeal is denied.

## SUMMARY FINDINGS OF FACT

*I. Background*

1. The Garrison was the contracting office for Aberdeen Proving Ground (APG) (tr. 1/57). One of the Garrison's customers was the APG's Army Community Services (ACS). The ACS in turn had several customers, such as the Chemical Materials Activities (CMA). (Tr. 1/56-57) One program ACS offered to its customers was the Family Advocacy Program (FAP) (R4, tab 1 at 18-21). The Installation Management Command (IMCOM) exercised oversight of ACS's programs—including FAP (tr. 1/127). IMCOM did that by accrediting ACS programs every three years, and conducting audits between those accreditations (tr. 1/125-26).

2. The FAP had a point of contact (POC), who had significant responsibilities related to spousal and child abuse prevention. As a result, the FAP had to have a FAP POC. (Tr. 1/117) By regulation, the FAP POC responsibilities revert to the ACS Director when there was no dedicated FAP Manager (FAPM) (tr. 1/83, 116-17).

*II. The Contract*

3. On 28 August 2014, the Garrison awarded Contract No. W56ZTN-14-P-0033 (0033 contract), a commercial items contract, to Harvey to provide various FAP classes (R4, tab 1 at 1, 6, 18-21). In particular, the 0033 contract required, at a minimum, that Harvey provide the following classes every year: 25 child abuse prevention briefings; 25 community briefings; 30 bullying prevention classes; 40 couples effective communication classes; 25 anger and stress management classes; 25 effective parent and child communication classes; and annual troop training (*id.* at 18-19, 25; tr. 1/42-43). Thus, at a minimum, the 0033 contract required 180 combined class sessions per year.

4. The period of performance was:

| Base Year | 2 September 2014—1 September 2015 |
| Option Year 1 | 2 September 2015—1 September 2016 |
| Option Year 2 | 2 September 2016—1 September 2017 |

(R4, tab 1 at 7)

5. The 0033 contract stated that "[t]he contractor shall furnish all supplies, equipment, and services required to perform work under this contract that are not listed under Section 3 of this" performance work statement (PWS) (R4, tab 1 at 16). In particular, the 0033 contract required that the "contractor shall, semi-annually and as needed, update instruction materials" (*id.* at 21). Section 3.5. stated that the "[c]ontractor may use all resource materials currently on hand. Contractor may suggest the purchase of additional curriculum and resources for inclusion in the resource material. Contractor's suggestions shall create no obligation of the Government to purchase or pay for additional curriculum and resources." (*Id.* at 15)

6. Further, the 0033 contract stated that "[t]he contractor is responsible for developing publicity for classes as indicated in paragraph 15c(1) in conjunction with DFMWR Marketing Manager" (R4, tab 1 at 22).

7. The 0033 contract also required coordination with the FAP POC (R4, tab 1 at 7-9, 18-22).

8. Further, the 0033 contract contained the commercial items termination for convenience clause under FAR 52.212-4(l), which stated that "[t]he Government reserves the right to terminate this contract, or any part hereof, for its sole convenience" (R4, tab 1 at 30). This clause also allows recovery of "a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the contractor can demonstrate to the satisfaction of the Government using its standard record keeping system have resulted from the termination" (*id.*).

2

*III. Performance*

9. There is no evidence of malice or a specific intent to harm Harvey (tr. 1/148).

10. In November 2014, the ACS Director and FAPM were relocated (tr. 1/20). At the hearing, Tristana Harvey—the owner of Harvey (tr. 1/5) testified that a new FAPM—Rosaline Smith—was not appointed until May 2015 (tr. 1/20). Dr. Harvey testified that the delay in appointing an ACS Director and a FAPM inhibited her ability to perform, but she did not specify how the delay impacted her (tr. 1/20, 35).

11. On 15 July 2015, Jennifer Eichner was appointed the ACS Director (tr. 1/111). Ms. Eichner was brought in to address the fact that IMCOM had not accredited APG's ACS in nine years (tr. 1/113-14).

12. In October 2015, Jennifer Buchness was appointed the contracting officer (CO) on the 0033 contract (tr. 1/38).

13. In October 2015, Ms. Smith ordered materials for an unspecified class (tr. 1/20). However, Dr. Harvey did not receive those materials until March or April of 2016 (tr. 1/206-07). Dr. Harvey testified that that delay inhibited her performance, but she fails to specify how that delay impacted her (tr. 1/20). ACS had a library of curriculum materials available for Harvey's use (tr. 1/118-19).

14. In late March 2016, Ms. Eichner reviewed a marketing request for a 5 April 2016 couples effective communications class for spelling and grammatical errors (tr. 1/130, 189, 191; ex. A-20). Dr. Harvey testified that obtaining Ms. Eichner's approval for marketing material delayed program delivery (tr. 1/22, 34-35).

15. On 8 April 2016, Dr. Harvey emailed Alan Hickox—who was the contracting officer representative (COR) at the time (tr. 1/21, 10-13; ex. A-15 at 1-2). She complained that she was having problems performing the 25 sessions of community briefings because the civilian staff did not want to attend the briefings on domestic violence and child abuse. Mr. Hickox responded that "[t]his appears to be a case where government requirements changed. This will not be counted against your performance of contract specified tasks." (Ex. A-15 at 1) Ms. Buchness testified that Mr. Hickox did not have the authority to make determinations regarding the contract's terms (tr. 1/189).

16. In May 2016, IMCOM conducted an audit of ACS (R4, tab 9 at 1). A major finding of the audit was that:

> FAP prevention and education is not being provided to an adequate level. FAP Educator contractor does not appear to be providing multiple classes required by PWS; those that are provided do not seem to meet frequency outlined

3

in service summary. Contractor non-compliance could result in life/health/safety impacts to community without appropriate prevention and education services.

(*Id.* at 3)

17. Ms. Buchness appointed Ms. Eichner as the new COR on 23 May 2016 (R4, tab 21 at 1; tr. 1/49).

18. Ms. Eichner reviewed Client Tracking Services (CTS)—a computer program that permitted users to view what classes were being taught (tr. 1/20). That review confirmed that "much of the training specified in the contract was not being conducted." In particular, Ms. Eichner determined that Harvey had only completed 63 hours of training in fiscal year (FY) 2016. Ms. Eichner determined that Harvey provided no bully prevention, couples effective communication, anger and stress management, or effective parents and child communication classes between July 2015 and July 2016. (R4, tab 21 at 1; tr. 1/22-23)

19. On 26 May 2016, Dr. Harvey requested to reschedule an abuse prevention class scheduled for 8 June 2016 (ex. A-16 at 2). The client did not want to reschedule because of the large number of attendees, and forwarded the request to Ms. Eichner. Ms. Eichner emailed Dr. Harvey asking if she could keep the scheduled training. (*Id.* at 1)

20. On 6 June 2016, Dr. Harvey sent a letter to the Garrison indicating that she had attempted to hire additional trainers, but that she was unsuccessful in that attempt. She further stated that she had to be available to pursue and conduct other opportunities. Therefore, Dr. Harvey stated that "[t]his letter shall serve as written notice that I will not seek an exercise of Option Year 2 for the FAP Educator contract." (R4, tab 11 at 1)

21. On 9 June 2016, Dr. Harvey emailed Ms. Eichner inquiring about a 14 June 2016 couples effective communication course. Dr. Harvey stated that the marketing material was submitted to Ms. Smith, but she had not received any information on whether the marketing was sent out. Ms. Eichner responded that Dr. Harvey never submitted the marketing material. (Ex. A-24 at 1)[1]

---

[1] Ms. Eichner used the passive voice, stating that the marketing material "was never submitted." Given that Ms. Eichner was responding to an email in which Dr. Harvey referred to Dr. Harvey's submission of material to Ms. Smith, it is clear that Ms. Eichner was stating that Dr. Harvey never submitted the marketing material. (Ex. A-24 at 1)

22. In early July 2016, a customer was attempting to reach Dr. Harvey on an urgent matter. Dr. Harvey was not in her office, and the customer wanted to speak to a live person instead of leaving a voicemail. (R4, tab 15 at 1; tr. 1/145) The customer called ACS's main number, and a volunteer receptionist transferred the call to Ms. Eichner (*id.*; tr. 1/140). Dr. Harvey later confronted the volunteer about the incident, grabbed her by the arm, and made her cry (R4, tab 15 at 1; tr. 1/140). Ms. Eichner testified that the volunteer was "visibly upset, shaking" (tr. 1/140). Ms. Eichner described Dr. Harvey's conduct as "very confrontational" (tr. 1/137). Ms. Eichner informed Dr. Harvey that her behavior was inappropriate (tr. 1/140).

23. On 12 July 2016 at 1:00 p.m., Dr. Harvey was scheduled to conduct an annual troop training at COL Farmer's office, which was located at the CMA on APG South (R4, tab 15 at 3; ex. A-12 at 1).[2] At 12:05 p.m., Jeannette Dennis—COL Farmer's administrative assistant—emailed Dr. Harvey stating that "COL Farmer is still on APG-North for an earlier appointment. Could he just meet you at 1pm at your office instead of you coming here to APG-South?" Dr. Harvey did not respond to that email before the 1:00 p.m. scheduled training. (R4, tab 15 at 3) Further, Ms. Dennis—who was seated down the hall from COL Farmer's office at the time (tr. 1/97)—indicated that Dr. Harvey did not appear at COL Farmer's office for the 1:00 p.m. training. Rather, at 1:10 p.m., Dr. Harvey emailed Ms. Dennis stating that Dr. Harvey "was actually on APG South all day." (R4, tab 15 at 3)

24. Ms. Dennis called Ms. Eichner to complain (R4, tab 21 at 2). Ms. Dennis complained that that was the fourth time that Dr. Harvey had cancelled or rescheduled the training for COL Farmer (R4, tab 21 at 2; tr. 1/134). Ms. Dennis was quite upset, and asked Ms. Eichner to conduct the training instead of Dr. Harvey (*id.* at 2; tr. 1/137).

25. Ms. Eichner spoke to Dr. Harvey about CMA's concerns (R4, tab 21 at 2; tr. 1/135). Dr. Harvey claimed that she had been at COL Farmer's office from 12:30 p.m., but that Ms. Dennis was not there because she was on leave that day (R4, tab 15 at 2-3; tr. 1/135-36). Ms. Eichner reported Dr. Harvey's statement to Ms. Dennis. Ms. Dennis responded that she was in the office, as shown by her 12:05 p.m. email. Ms. Dennis concluded "it's making me irate that [Dr. Harvey] is now lying about all of this and about me and this office. That is unacceptable!" (R4, tab 15 at 2-3)

26. Meanwhile, Dr. Harvey drove to COL Farmer's office, confronted Ms. Dennis, and demanded to know why she had spoken to Ms. Eichner about the missed appointment (R4, tab 21 at 2; tr. 1/136). Dr. Harvey addressed Ms. Dennis in a "combative manner," as if

---

[2] APG is divided into two installations—APG North and APG South. Dr. Harvey's office was located on APG North. (Tr. 1/96) COL Farmer's office was located on APG South (R4, tab 15 at 3; tr. 1/149). It took about 25 minutes to drive between the two installations (tr. 1/96).

5

Dr. Harvey were looking for a fight (tr. 1/91, 137). Dr. Harvey said something to the effect of "I'm Harvey and we have a problem here" (tr. 1/137). At that point, COL Farmer came out of his office. Dr. Harvey then walked down the hallway and addressed her complaints to COL Farmer directly. (*Id.* at 14-17)

27. Ms. Eichner reported the incident to Ms. Buchness (tr. 1/57-58). Ms. Eichner indicated that she was no longer comfortable with Dr. Harvey representing ACS (R4, tab 15 at 1). Ms. Eichner informed Ms. Buchness that the ACS staff could perform the required training because there was only one training scheduled in August. Moreover, ACS hired a new FAPM effective 25 July 2016, who was qualified to teach classes. (R4, tab 21 at 2; tr. 1/146)

28. Ms. Buchness contacted Ms. Dennis (tr. 1/57-58). Ms. Buchness testified that Ms. Dennis:

> [W]as extremely displeased with the confrontation that took place. She found it to be very unprofessional. She also found it to be, in somewhat she felt attacked as she stated.
>
> Not only did she express displeasure with the contractor's behavior but she, she expressed the COL's displeasure with the contractor's behavior and that the contractor took it upon themselves to address the COL directly as opposed to going through the proper chain-of-command or addressing the administrative assistant or addressing the COR which is where that correspondence should have ceased.

(Tr. 1/60-61)

29. Ms. Buchness decided to terminate the contract for three reasons. The primary reason was Dr. Harvey's unprofessional conduct with CMA. The second reason was that Harvey was not conducting some classes, or was rescheduling them so often that they were not being conducted in a timely manner. The third reason was that the government could perform the services itself. (Tr. 1/62-63, 67) Ms. Buchness thought those reasons justified a default termination, but she determined that a termination for convenience was in the best interest of the government (tr. 1/67).

30. On 13 July 2016, Ms. Buchness notified Harvey that the Garrison would terminate the contract for convenience effective 15 July 2016 (R4, tab 16 at 1).

6

31. On 10 August 2016, Harvey submitted a termination settlement proposal (R4, tab 19). Harvey sought $10,000, which represented the contract price for the remainder of option year 1. Harvey also requested that Ms. Buchness provide a letter attesting to its positive performance. (*Id.* at 1)

32. On 31 October 2016, the Garrison denied Harvey's settlement proposal (R4, tab 22).

33. The Garrison did not hire a new contractor to provide FAP classes. Rather, the government provides the FAP classes. (Tr. 1/199-200)

34. Harvey timely appealed to the Board. In its appeal, Harvey seeks $68,824—which represents the contract price for the remainder of option years one and two—and that we order the Garrison to provide a letter attesting to Harvey's positive performance (compl.).

## DECISION

Harvey argues that the termination for convenience was in bad faith and breached the duty of good faith and fair dealing.[3] It is correct on both counts.

*I. The Termination for Convenience Was Proper*

When the Government terminates a commercial item contract for convenience, a contractor is entitled to recover a percentage of the contract price reflecting the percentage of the work performed prior to the termination plus reasonable charges the contractor can demonstrate using its standard record keeping system have resulted from the termination. FAR 52.212.4(l). Harvey has not even attempted to establish entitlement to such a percentage of the contract price or charges.

Rather, Harvey argues that the termination for convenience was improper because it was made in bad faith. The "government has the right to terminate at will

---

[3] We do not possess jurisdiction to order the Garrison to provide a letter attesting to Harvey's positive performance because that would constitute specific performance or injunctive relief. *MicroTechnologies, LLC*, ASBCA Nos. 59911, 59112, 15-1 BCA ¶ 36,125 at 176,350; *CDM Constructors, Inc.*, ASBCA No. 59524, 15-1 BCA ¶ 36,097 at 176,239-40. Nor do we possess jurisdiction over Harvey's claim for $58,824 for the contract price for option year two because Harvey never submitted such a claim to the contracting officer (finding 31). *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995) (en banc).

7

under the termination for convenience clause and, absent bad faith or a clear abuse of discretion, the contracting officer's decision is final." *Puget Sound Environmental Corp.*, ASBCA No. 58828, 16-1 BCA ¶ 36,435 at 177,596 (citing *John Reiner & Co. v. United States*, 325 F.2d 438, 442 (Ct. Cl. 1963)). Likewise, it is within an agency's discretion to decide whether to exercise an option, and we do not possess jurisdiction to order it to do so. *Statistica, Inc.*, ASBCA No. 44116, 92-3 BCA ¶ 25,095, at 125,126; *Pemco Aeroplex, Inc.*, ASBCA No. 47402, 95-2 BCA ¶ 27,853, at 138,889. The narrow exception to that rule requires a showing that the agency acted in bad faith in deciding not to exercise an option. *Puget Sound*, 16-1 BCA ¶ 36,435 at 177,596.

It is well established that government officials are presumed to act in good faith. *Puget Sound*, 16-1 BCA ¶ 36,435 at 177,597 (citing *Road and Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368 (Fed. Cir. 2012)). To prove that a government official acted in bad faith, a contractor "must show a 'specific intent to injure' by clear and convincing evidence." *Id.* (quoting *Road and Highway*, 702 F.3d at 1369). That requires a showing of well-nigh irrefragable proof of malice or a specific intent to injure. *In re IMS Engineers-Architects, P.C.*, ASBCA No. 53471, 06-1 BCA ¶ 33,231, at 164,672. "Due to this heavy burden of proof, contractors have rarely succeeded in demonstrating the Government's bad faith." *Puget Sound*, 16-1 BCA ¶ 36,435 at 177,597 (citing *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996)).

Here, there is no evidence that the Garrison acted in bad faith, or clearly abused its discretion (finding 9). On the contrary, the evidence shows that the Garrison reasonably terminated for convenience for three reasons. First, the government could provide the classes itself, as shown by the fact that the Garrison did not hire a new contractor to provide the FAP classes (finding 33). Second, Dr. Harvey missed or rescheduled four trainings with COL Farmer, mislead Ms. Eichner about being at the fourth training, accused Ms. Dennis of lying, and confronted Ms. Dennis and COL Farmer about Ms. Dennis's complaint to ACS (findings 23-26).

Third, those were not the only classes that Harvey missed. The IMCOM audit found that Harvey "does not appear to be providing multiple classes required by PWS" (finding 16). The 0033 contract required Harvey to provide 180 combined class sessions per year (finding 3). However, Harvey only provided 63 hours of training of any type for FY 2016—which constituted about one third of the 0033 contract's minimum requirements. In particular, Harvey did not provide any bullying prevention, couples effective communications, anger and stress management, or parent and child communications classes between July 2015 and July 2016. (Finding 18) That was despite the fact that the 0033 contract required that, each year, Harvey provide 30 bullying prevention, 40 couples effective communications, 25 anger and stress management, and 25 effective parent and child communications classes (finding 3). Because there was no bad faith or clear abuse of discretion, the termination for convenience was proper.

8

*II. No Breach of Duty of Good Faith and Fair Dealing*

The Garrison did not breach its duty of good faith and fair dealing. Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). However, a party to a contract cannot use an implied duty of good faith and fair dealing to expand another party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions. *Agility Pub. Warehousing Co. KSCP v. Mattis*, 852 F.3d 1370, 1384 (Fed. Cir. 2017). As a result, "if the government has the contractual right to terminate a contract for convenience, the government may exercise that right without breaching the duty of good faith and fair dealing." *TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336, 346 (2013).

Here, the Garrison had the contractual right to terminate the 0033 contract for convenience (finding 8). Moreover, as discussed above, the Garrison properly exercised that contractual right. In particular, as discussed above, the Garrison did not interfere with Harvey's performance. Therefore, there was no breach of the duty of good faith and fair dealing.

## CONCLUSION

The termination for convenience was proper as there was no bad faith and it did not violate the duty of good faith and fair dealing and Harvey is not entitled to recover. Therefore, the appeal is denied.

Dated: 11 August 2017

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60927, Appeal of Tristana R. Harvey Career Planning & Consulting Series LLC, rendered in conformance with the Board's Charter.

Dated:

_____
JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
