ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of --                              )
                                          )
Catherine Kurkjian                        )        ASBCA No. 61154
                                          )
Under Contract No. W911QY-12-P-0194       )

APPEARANCE FOR THE APPELLANT:              Timothy M. Burke, Esq.
                                            Law Offices of Timothy M. Burke
                                            Needham, MA

APPEARANCES FOR THE GOVERNMENT:            Scott N. Flesch, Esq.
                                            Army Chief Trial Attorney
                                           Dana J. Chase, Esq.
                                            Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE PROUTY

        Appellant, Mrs. Catherine Kurkjian, was a technical writer who worked as a
contractor for the Army's Natick Laboratories in Massachusetts (Natick Labs). During
the base year of her contract, she, her co-workers, and her superiors had many
disagreements, culminating with (unfounded) fears of violence from Mrs. Kurkjian on
the part of Natick Labs. As a consequence, Natick Labs concluded her performance of
the base year of the contract about a month early, though it paid her in full, and
declined to exercise its next option year on her multi-year contract. The questions
before us are whether the government wrongfully terminated the base year of her
contract and whether the government wrongfully failed to exercise its options on her
contract, with Mrs. Kurkjian alleging that she was punished for whistleblowing
activities. Given the high burden required for success on the challenges brought by
Mrs. Kurkjian, we deny her appeal.

I. *Background Prior to the Contract at Issue*

Mrs. Kurkjian was a full time federal employee who worked as a food technologist and then later as a technical writer at Natick Labs[2] from 1984 to 1993 and was, by all accounts, successful in her work. She left federal employment to raise her children at the end of this period. In 2006, a former co-worker called her and suggested that she return to work at Natick Labs as a part-time contract employee. She agreed, and from 2006 through 2012, she submitted bids to perform year-long contracts for Natick Labs as a technical writer and was awarded contracts for those years. (Tr. 1/12-19)

II. *The Contract and Mrs. Kurkjian's Duties*

On February 28, 2012, Mrs. Kurkjian was awarded the above-captioned contract (the contract) to provide "document preparation and technical support" to the Food Engineering Services Team (FEST) at Natick Labs (R4, tab 1 at 1, 3). The contract consisted of a base year from February 28, 2012 through February 26, 2013 for which she would be paid $38,110, and three one-year options, each with a value of $37,000 (R4, tab 1 at 5-8). The contract incorporated by, reference several provisions of the Federal Acquisition Regulation (FAR), including FAR 52.217-9, OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 2000), which, as its title suggests, governs the exercise of options extending contract performance (R4, tab 1 at 8). In relevant part, FAR 52.217-9 provides:

> (a) The Government may extend the term of this contract by written notice to the Contractor within ____ [*insert the period of time within which the Contracting Officer may exercise the option*]; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least ____ days [*60 days unless a different number of days is inserted*] before the contract expires. The preliminary notice does not commit the Government to an extension.

---

[1] Counsel for Mrs. Kurkjian offered evidence from her deposition as support for some of the facts that he sought to be found on her behalf (*see, e.g.*, app. br. at 7). (Note that the brief has no page numbers, thus, the reader must count for themselves). For the reasons set forth in the "Decision" section below, we do not consider such evidence because it was not properly placed before us.

[2] What we refer to as "Natick Labs" in this opinion has gone through several different name changes throughout Mrs. Kurkjian's association with the organization (tr. 1/12). For simplicity, however, we will refer to it as Natick Labs throughout.

FAR 52.217-9 (brackets, italics, and blanks in the original). We have reviewed the contract and nothing in its language, nor anything pointed out by the parties, purports to fill in the blanks of this provision that was incorporated into the contract.

The contract also incorporates by reference FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (JUN 2010) (*see* R4, tab 1 at 8). FAR 52.212-4 contains a termination for convenience clause at FAR 52.212-4(l). In relevant part, this clause provides that:

> (l) *Termination for the Government's convenience*. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. . . . Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination.

The Performance Work Statement (PWS) for the contract is approximately three pages long and we will not duplicate it here. In relevant part, it expects Mrs. Kurkjian to work approximately 20 hours a week and to be paid $37 per hour (R4, tab 1 at 4). In addition to a set of "General Contractor Tasks," her "Specific Contractor Tasks" included:

> convert[ing] raw technical data received from CFD [the Combat Feeding Directorate at Natick Labs] project managers/food technologists and industry into formal procurement documents.

(*Id.*)

She was also:

> responsible for developing the [procurement] document, coordinating with all applicable government agencies and industry, resolving comments received from government agencies and industry, and preparing the document for final approval reviews.

(*Id.*)

At the hearing, Mrs. Kurkjian described her responsibilities, consistent with the PWS. In broad brushstrokes, her job was to take very technical specifications for food

3

components of meals ready to eat (MREs) and turn them into a document suitable for the government to use in providing specifications for a procurement. Mrs. Kurkjian's supervisor would assign a particular food item to her – say, a mixed fruit plate – and provide a technical data package to her, and then she would rewrite it, adding such things as quality assurance requirements, to make it ready for use in a procurement. After she drafted the package, it would undergo technical review in-house before being sent for co-ordination with the United States Department of Agriculture (USDA), the procurement center, the military services, and industry. Mrs. Kurkjian would then receive comments from these different stake-holders and seek to resolve them before making a final "approval draft" for final agreement before being used as part of a solicitation. (Tr. 1/128-33)

### III. *Disagreements Between Mrs. Kurkjian and her Superiors and Co-workers*

As will be seen below, in the beginning of the contract's performance period in 2012, it appears that Mrs. Kurkjian's work was unexceptional and that all was going well. Salmonella and Aflatoxin testing arose as an issue in some of the products that she was working on, but management did not appear to have a problem with Mrs. Kurkjian's approach to seeking consensus for the proper language on such testing. For reasons that appear to be internal to Mrs. Kurkjian, however, in the fall of 2012, significant relationship problems began to arise between Mrs. Kurkjian and her coworkers and supervisors leading to a very tense work environment and her effective refusal to take on additional projects.

Turning to the beginning of contract performance, one of the MRE food products that Mrs. Kurkjian took responsibility for in 2012 was the "Nut and Fruit Mix." Email correspondence demonstrates that issues involving Salmonella testing requirements for that product had become a topic discussed between Mrs. Kurkjian and Ms. Jeanette Kennedy,[3] in July 2012, though it did not appear (at first) to be particularly contentious (R4, tab 27). Another matter she was involved with, "Nut Butter and Nut Spreads," was the subject of email correspondence between Mrs. Kurkjian and Ms. Jill Bates,[4] also regarding Salmonella testing in July and August 2012. This correspondence references Mrs. Kurkjian's discovery that Salmonella issues had also been extensively discussed related to the "Dairy Shakes" product. (R4, tabs 28, 47)

In August 2012, Mrs. Kurkjian testified, she spoke with Dr. Gerald Darsch, Director of the Combat Feeding Directorate,[5] about concerns regarding her supervisor,

---

[3] Ms. Kennedy was the project officer from Combat Feeding (tr. 1/86).

[4] Ms. Bates was the contracting officer's representative (COR) for Mrs. Kurkjian's contract (tr. 2/56).

[5] *See* tr. 1/35, tr. 1/146-47.

Ms. Mary Canniff's[6] absence from the office due to maternity leave, and Ms. Canniff's direction to coordinate certain Salmonella testing questions with "the procurement center" rather than the USDA.  Dr. Darsch,[7] according to Mrs. Kurkjian, was sympathetic to her concerns and wanted to get the coordination done correctly (tr. 1/35-38). Mrs. Kurkjian testified that she had similar discussions with Dr. Melvin Carter (the new FEST Team lead (*see* tr. 1/192)) when he arrived at the office in November 2012,[8] and that they were productive (tr. 1/48-49).

In early September 2012, correspondence demonstrated that the Nut and Fruit Mix product description was delayed as a result of the Salmonella testing concerns (R4, tab 30).

On September 14, 2012, Ms. Canniff sent an email to Mrs. Kurkjian and another technical writer assigning them new documents to prepare.  Mrs. Kurkjian responded on September 18, declining to work on the one assigned to her because it appeared to involve Salmonella issues, whose "volatility" made them bad for a part-time contractor, like her, to work on, but expressing her willingness to work on future documents.  (R4, tab 35)  Two days later, Mrs. Kurkjian offered to do some work on some documents about cookies, which Ms. Bates approved without any apparent complaint (R4, tab 36).

In the meantime, through November 2012, Mrs. Kurkjian continued to engage in email correspondence with various outside stake-holders, including the USDA, to coordinate the Salmonella testing requirements for the Nut and Fruit Mix (R4, tabs 38-40). On November 27, 2012, Mrs. Kurkjian had a meeting with Dr. Carter and Steven Moody (apparently, a higher level manager at Natick Labs) to finalize the paragraphs regarding Salmonella testing (R4, tab 41).  More email exchanges ensued, but by December 4, 2012, it appears that there was general agreement regarding the proposed Salmonella testing language (R4, tab 42).

Although the email correspondence during this period was generally professional, in-person meetings were not so cordial.  According to Ms. Bates (previously identified as the COR), sometime in the September through November 2012 time frame, Mrs. Kurkjian called a meeting to discuss Salmonella testing issues in which she became agitated and was "screaming about things" and ultimately "walked

---

[6] Ms. Canniff was the FEST team leader much of 2012 (tr. 1/86); though she went on maternity leave in late July 2012, she still remained actively involved in correspondence and worked at Natick Labs (tr. 1/36-37).

[7] Dr. Darsch did not testify at the hearing:  he is retired and was ill (tr. 1/140-41, 2/124).

[8] Mrs. Kurkjian testified that he began in September 2012 (tr. 1/48), but the best evidence – Dr. Carter's testimony – is that he actually began in early November, 2012 (tr. 1/192).

out on the meeting."[9]  (Tr. 2/85-86)  Dr. Carter, who was effectively Mrs. Kurkjian's second-level supervisor (*see* tr. 1/192-94), testified to having to deal with reports of Mrs. Kurkjian's engaging in a "shouting match" with another employee from another section (tr. 1/194).

In one conversation, which we surmise was in the December 2012 time period, Dr. Carter testified, he asked Mrs. Kurkjian to better get along with other people. According to Dr. Carter, she responded by intimating some sort of conspiracy theory and that the office was responsible for the deaths of two former employees.[10] (Tr. 1/241-42)  Dr. Carter testified that he had at least two such conversations with Mrs. Kurkjian, with similar results, prior to the conclusion of her contract performance (tr. 1/243-44).  He also described his experience of engaging in several conversations with Mrs. Kurkjian and her turning the conversations from their intended topics to being about people at Natick Labs being involved in a conspiracy and that "they were after her" (tr. 1/195).

Mrs. Kurkjian presented a different picture of her conversations with Dr. Carter. She testified that Dr. Carter had "continuously" threatened her option years "if I didn't do as I was told" (tr. 1/53).  She also testified that Dr. Carter told her to "care less, think less, and ask less questions and do as you're told" (tr. 1/68-69).  Dr. Carter flat out denies both sets of allegations (tr.1/209).  The balance of the evidence mostly supports Dr. Carter's version of events.  To be sure, we have little doubt that Dr. Carter instructed Mrs. Kurkjian to do as she was instructed, given his palpable frustration (even when he testified some seven years after the fact) that Mrs. Kurkjian would not do something she was told to do if it was not what she wanted to hear (tr. 1/219). Nevertheless, as detailed more below, from her emails, to her claim, to her uniformly reported behavior, we discern a tendency on Mrs. Kurkjian's part to perceive the worst of her co-workers in ways that are not borne out by the objective evidence.  Although we do not believe that she intentionally testified falsely, we find Dr. Carter's testimony more credible here.[11]

---

[9] In a December 18, 2012 email, Mrs. Kurkjian referred to a December 13, 2012 meeting that she "couldn't finish" and for which she apologized (R4, tab 71 at 213).  It is possible that this is the meeting that Ms. Bates is referring to, though it was slightly later than the time period she believed the meeting took place.

[10] Dr. Carter testified that he hoped Mrs. Kurkjian's references to the office's killing two former employees were meant to imply that it did so by virtue of the stress that they were under, as opposed to an actual murder, but that the language she used was that Natick Labs "killed" them (tr. 1/242-43).  While we generally credit Dr. Carter's testimony, we believe that the more benign interpretation of Mrs. Kurkjian's words is the better one.

[11] We note that Dr. Carter testified by telephone, thus we were unable to observe his physical demeanor.  Nevertheless, we did observe that his oral testimony was straightforward and included no hint of evasion.

Mrs. Kurkjian's email correspondence about this time reflected a negative trend similar to that reflected in her conversations with Dr. Carter and co-workers. On December 18, 2012, Mrs. Kurkjian sent an email to Ms. Bates stating that she would "have to take back my offer to work on" the chocolate covered peanut butter candy cookie project. Her primary reason for declining the work was that:

> the Cookie CID does not currently have Salmonella requirements. After what has transpired over the past year in regard to Nut and Fruit Mix, I can ill afford to put myself in a position that involves initiation of actions in regard to Salmonella testing of this new chocolate covered peanut butter candy cookie.

(R4, tab 70 at 211)

The same day, Mrs. Kurkjian sent an email to Ms. Julie Smith[12] seeking additional information for the Nut and Fruit Mix document. Ms. Smith responded that it would be best to have a high level meeting in the new year to further discuss the document considering the feedback that had been received from external sources, and to make a collective decision about what to do next. Mrs. Kurkjian responded to this email on December 19, with an email worth replicating in full:

> Hi Julie,
>
> I appreciate your response but hope you understand how disconcerting I would find your comments considering the derogatory consequences that I suffered in my quest to do what I thought was right and in CFD's best interest.
>
> Suffice to say, I have made it very clear as to my position over the past 7 months; that is, I believed that a consolidated Natick reply was needed to resolve the issues in this matter. Considering the support provided by Claire Lee over this past year and the need for her continued input; I am assuming that PORT was inadvertently omitted from your e-mail distribution, so I have included her in this reply.
>
> Sincerely,
> Catherine Kurkjian

---

[12] Ms. Smith was the project officer for the Nut and Fruit Mix (tr. 1/99-100).

7

(R4, tab 73 at 221-23) Dr. Carter, who was cc'd on this email, sent a response to Mrs. Kurkjian the same day telling her to "[s]top the email traffic you are sending out concerning this document." (R4, tab 73 at 221) He did so because he felt Ms. Smith's email had not merited the strong negative reaction from Mrs. Kurkjian and that the confrontation between the two needed to be stopped (tr. 1/196-97). But Dr. Carter's directive did not end the contretemps within FEST.

Mrs. Kurkjian sent a relatively long email to Dr. Carter in response, explaining that she had not intended to send further emails, but had felt compelled to by Ms. Smith's email. She explained that she had never felt such anxiety during her tenure at Natick Labs as she did at the time and that she felt a "compulsion to have to defend myself, my work, [and] my relationships with coworkers." She went on to explain that she felt her reputation was being questioned. Mrs. Kurkjian asserted that she had been told that she was "too paranoid, too sensitive, and taking 'it' too personally," but that if Dr. Carter had been in her shoes, seeing so many people depart, including two who had died, he would understand. She characterized the actions of her coworkers as "driving another soul into the ground for caring too much." (R4, tab 73 at 220-21)

Nevertheless, Mrs. Kurkjian continued to work on matters to which she was assigned. On December 20, 2012, Mrs. Kurkjian exchanged emails with Ms. Meg Aylward regarding the document number for a Thai Chicken product, which was already being used for another product. On December 26, 2012, Mrs. Kurkjian emailed to Ms. Bates that she had intended to send the document with the new number, but felt she would have to change the document date if she did so. (R4, tab 76) There followed some back and forth around the end of December/beginning of January about what appeared to be bureaucratic minutiae about when to update certain portions of the document due to a coming production test, but none of it appeared particularly contentious (*see* R4, tab 79). In the early afternoon of January 3, 2013, Ms. Aylward sent an email to Ms. Bates and Mrs. Kurkjian stating that the only changes necessary prior to the production test were the document number and the date, and that the rest could wait (R4, tab 81 at 295-96). Ms. Bates concurred shortly thereafter (*id.* at 295). Mrs. Kurkjian responded by sending an email to Ms. Bates, explaining that she felt that she was "in quite a quandary." She presented herself as having the choice of doing what she was told and submitting an outdated document with a new date or doing "what I think is right and say[ing] that I am not comfortable re-dating the document without updating the information, with the knowledge that it will be shot back to Gregory Wilson under the guise that I am causing problems/and or unwilling to cooperate." She closed by asking Ms. Bates "as my COR" to advise her on the consequences of her choice on whether the government would exercise her contract option. (*Id.*)

The email traffic appears to be the only significant discussion about this matter between the government and Mrs. Kurkjian, though her strong reaction in the January 3, 2013 email was a matter of concern by Dr. Carter, who raised it with the contracting officer (CO) and others (*see* R4, tab 88). The record before us supports a finding that

8

the fact that the document was not updated in the way that Mrs. Kurkjian desired was not nearly as significant an issue as she implied in her email, because the outdated portions of the document were mere "boilerplate" that would be easy to amend and would be immaterial to the testing that needed to be done in the short term (tr. 2/80-82).

By this time, Ms. Bates and Dr. Carter described the atmosphere at FEST as other employees "walking on eggshells" around Mrs. Kurkjian (tr. 1/194 (Dr. Carter's testimony), tr. 2/84 (Ms. Bates's testimony)).

### IV. *Things Come to a Head and the Option is not Exercised*

#### A. *Events Leading up to Mrs. Kurkjian's Option not Being Exercised*

By late December 2012, both Mrs. Kurkjian and the management at FEST were contemplating the exercise of the option for another year of Mrs. Kurkjian's contract. As is evident from Mrs. Kurkjian's January 3, 2013 email to Ms. Bates, she was asking questions about how her actions would affect the government's decision to exercise the option (R4, tab 81 at 295). She also testified that Dr. Carter had "continuously" threatened her option years "if I didn't do as I was told" (tr. 1/53).[13]

On Monday, January 7, 2013, Mrs. Kurkjian and Ms. Bates exchanged some emails about an issue regarding Mrs. Kurkjian's most recent voucher and problems with her computer. Ms. Bates assured Mrs. Kurkjian that she would help her clear up any problem with the voucher and that the computer problems were common due to the migration to a new operating system. Ms. Bates also inquired about her well-being and offered to help her if she could. Mrs. Kurkjian responded by inquiring about the status of her contract since she had heard that other similarly-situated contractors had been told that their contracts were being worked on but that she had not received such a notification. (R4, tab 82 at 334-35) Ms. Bates forwarded this email to Dr. Carter who forwarded it to Dr. Darsch (previously noted to be the Director of the Combat Feeding Directorate at Natick Labs). The direction given to Ms. Bates was not to discuss contracting actions with Mrs. Kurkjian but to schedule a meeting including Drs. Carter and Darsch and the CO on the morning of Wednesday, the 9th of January, in which she would be informed that she was not going to have her contract extended (R4, tab 82 at 333-34).

---

[13] As noted above, Dr. Carter denies this (tr. 1/209). Although we generally credit Dr. Carter's testimony on these matters, we would not be surprised if the issue of the option year came up in a tangential way in conversation between the two and Mrs. Kurkjian recalled it because it was so important to her, but Dr. Carter had no recollection of it because it was not germane to the main purpose of the conversation and was a mere aside. In any event, resolving this contradiction is unnecessary for our decision today.

Late in the day of January 8, 2013, Mrs. Kurkjian went to see Kathlynn Evangelos, Executive Assistant to Dr. Darsch.[14]  She told Ms. Evangelos that somebody had put documents on her desk that she hadn't put there and that she was very concerned about it. Ms. Evangelos found Mrs. Kurkjian's demeanor disconcerting and sent an email to Dr. Carter about the visit, as well as beginning a memorandum for record to document it. (R4, tab 85 at 354, tab 90; tr. 1/148-50)  After she left her office at about 6:50 p.m., Ms. Evangelos saw Mrs. Kurkjian standing alone in a dark office, then shortly thereafter, encountered her in the parking lot where a friend of Mrs. Kurkjian's, Helene Aucoin, was waiting to give her a ride home.  They engaged in conversation back inside the building in which, Mrs. Kurkjian spoke about the documents and was "rambling" about various topics, stating that people thought she was paranoid, but she was not and that "they're all against me."  (R4, tab 90 at 370; tr. 1/149-53)[15]  Mrs. Kurkjian made additional statements about there being a conspiracy against her and that people were somehow taking pictures in her computer (R4, tab 90 at 371).  Ultimately, Ms. Aucoin came into the building to assist Mrs. Kurkjian, and Ms. Evangelos returned to her own office. There, she called security for an escort to her car because of her concerns about Mrs. Kurkjian's mental state.  (R4, tab 90 at 371-72; tr. 1/153-54)

The next morning, at 7:00 a.m., Ms. Aucoin visited Ms. Evangelos in her office to discuss events from the prior evening.  She conveyed that she was there to help her friend, Mrs. Kurkjian, but not to cause trouble.  When Ms. Evangelos opined that Mrs. Kurkjian needed help, Ms. Aucoin responded that, "it's worse than you can imagine.  It's not just this place, it's everything."[16]  (R4, tab 90 at 372)

At 9:00 a.m. that morning, January 9, 2013, management convened a meeting to discuss Mrs. Kurkjian and her contract.  Present were Stephen Streeter, the CO (by telephone); Peter Tuttle, from the Office of Chief Counsel; Greg Wilson; Dr. Carter; Dr. Darsch; Ms. Bates; and Ms. Evangelos (R4, tab 91 at 373; tr. 1/155-57).  This meeting was originally intended to include Mrs. Kurkjian and be the venue in which she was informed that her contract would not be extended.  But the events of the previous day and evening caused management to hold this meeting without her before conducting a second meeting with Mrs. Kurkjian at 1:00 p.m. that day.  At the first meeting, it was

---

[14] Ms. Evangelos's job as Executive Assistant to Dr. Darsch was akin to being his chief of staff; he had a separate secretary (tr. 1/145).

[15] The memorandum for record by Ms. Evangelos at tab 90 of the Rule 4 supplement file, from which this summary is largely based, was made by her nearly contemporaneously with the events it documented (tr. 1/147-48), giving us particular confidence in its accuracy.

[16] Ms. Aucoin's statements about Mrs. Kurkjian's well-being are, nominally, hearsay, though our rules would permit their consideration if we so chose.  In any event, we consider them here as non-hearsay because we are not relying on them in the sense that we necessarily find them to be an accurate depiction of Mrs. Kurkjian's state, but that they were statements that may have influenced decision makers at Natick Labs.

agreed that the contract option would not be exercised and that Mrs. Kurkjian would be asked to stop work immediately and return her government-owned laptop computer, her Common Access Card (CAC), and keys. (R4, tab 91 at 373; tr. 1/155-56) In the memorandum for record describing this meeting, Ms. Evangelos wrote that the "decision was based on the best interests of the government due to fiscal uncertainties, quality of her work, challenges with her ability to get along with CFD team members and other concerns." (R4, tab 91 at 373; tr. 1/156-57) The option of terminating the contract for default was rejected by Dr. Darsch because he had no desire to give Mrs. Kurkjian any kind of "black mark" for future contracts – he just "wanted to end this peacefully" (tr. 1/160).

Before reporting to the 1:00 p.m. meeting, Mrs. Kurkjian visited Carol Winterhalter, the union representative at Natick Labs (tr. 1/106-08). Mrs. Kurkjian recognized that Ms. Winterhalter might not be able to help her because she (Mrs. Kurkjian) was a contractor, not a government employee, but she, nevertheless, sought her aid because she didn't know who else to go to (tr. 1/110-11, 113, 126-27). In any event, Mrs. Kurkjian left her government-owned laptop computer in Ms. Winterhalter's care out of a concern that management at Natick Labs would do something bad to it (tr. 1/107-08).

At the 1:00 meeting, Mrs. Kurkjian was informed that Natick Labs would not be exercising its option on her contract and that it had been decided to conclude her work on the base year of the contract at that point, although the government would pay the remainder of the money due on her contract[17] upon her submission of a voucher for it. During the meeting, Mrs. Kurkjian expressed her feeling that she was being "railroaded" out of her job and that she wanted representation. She also initially refused to provide information regarding the location of her government-owned laptop because, she claimed, there was information on it that was damaging to the government and she did not want it eliminated. She was informed that this could constitute theft of government property and ultimately identified Ms. Winterhalter as the person holding it. About the same time, Ms. Winterhalter contacted management about the laptop and arranged to have it returned to government custody. Throughout the meeting, Mrs. Kurkjian made many accusations that members of management were out to get her, that there was a conspiracy against her, and that her government laptop had been remotely tampered with. (R4, tab 91 at 374-78; tr. 1/105-11)

Mrs. Kurkjian was allowed to retrieve her personal items from the office she used at Natick Labs as well as personal items that were kept in the (now returned) laptop's carrying case, and then her husband was contacted to drive her home (tr. 1/109-10; R4, tab 91 at 378). She never worked on the contract again (tr. 1/103-04).

---

[17] This amount was $1,702.00 (*see* R4, tab 92 at 379).

## B.  *The Reasons why the Option was not Exercised*

At the hearing, Mrs. Kurkjian's counsel challenged the veracity of Ms. Evangelos's memorandum justifying the decision not to exercise the option.  We agree that, although fiscal constraints and uncertainty did exist, the testimony did not support a finding that they were a major contributor to the decision to not exercise the contract option (*see* tr. 1/166-68 (examination of Ms. Evangelos on this matter)).  On the other hand we perceive this to have been a "throw away" line in the justification portion of the memorandum and its inclusion is of little significance either way.  Concerns about Mrs. Kurkjian's ability to get along with her co-workers and do her work (*see* R4, tab 91 at 373), were very real.

As described above, the record is replete with testimony (that we find credible) and email from Mrs. Kurkjian, herself, demonstrating a terrible relationship between Mrs. Kurkjian, her supervisors, and her co-workers.  Although, Mrs. Kurkjian presented at the hearing as a conscientious professional, in late 2012 through the end of her time at Natick Labs, she demonstrated a belief that she was being persecuted and showed apparent overreaction to straightforward, non-confrontational directives from her superiors including a seeming refusal to do some categories of work.  The shouting matches described by the government witnesses are consistent with the tenor of the emails and we find, as a matter of fact, that the testimony that her co-workers were "walking on eggshells" is most likely accurate.  Dr. Carter's testimony that the work environment appeared likely to only get worse if Mrs. Kurkjian's option was exercised (tr. 1/204) is consistent with the evidence before us and appears to have been an opinion held in good faith.

Consistent with Dr. Carter's testimony, we need not find that Ms. Evangelos's fears of potential workplace violence were merited to conclude that they, too, were held in good faith.  It is certainly clear that, in the days leading up to the January 9 meeting, Mrs. Kurkjian had presented as being in crisis, based upon what she wrote in her emails; what she said to her co-workers and superiors; her behavior on the evening of January 8; and what her friend, Ms. Aucoin, told Ms. Evangelos.  To be clear, in the cold light of day, years after the fact, we do not believe there was an actual threat of violence from Mrs. Kurkjian, but we do understand why the concern arose.

We also find that, contrary to her allegations, Mrs. Kurkjian was not punished for any efforts on her part to protect the troops from Salmonella or Aflatoxin.  Her counsel points to no documentary evidence supporting this allegation, and in our careful review of the email traffic, we see none, ourselves.  To be sure, Mrs. Kurkjian testified that her stance on Salmonella and Aflatoxin testing made her unpopular with management and her co-workers (*e.g.*, tr. 1/34, 1/59-61, 1/68-72).  But the evidence is that this annoyance was centered on her failure to follow directions and do her job; not that she was holding out for the best testing for soldiers and her supervisors wanted to accept something more dangerous (*e.g.*, tr. 1/198-99, 1/218-20).  Mrs. Kurkjian made allegations in her testimony that Natick Labs kept certain documents away from her in

order to prevent her from getting involved and delaying approval of certain product descriptions (tr. 1/50-53). But she presented no evidence beyond speculation that this information was intentionally withheld from her (indeed, despite claiming that she did not get the folder she wanted, under questioning from the trial judge, she conceded that she received the information when she requested it (tr. 1/52-53)) and we find the assertion to be baseless and, unfortunately, consistent with the evidence that shows that she overreacted to reasonable actions on the part of her supervisors. We similarly find that her allegations that she was being punished or denied information in order to cover up her supervisors' willful violation of proper testing procedures (app. br. at 19) to be unsupported and not credible. The PhD scientist who led FEST, Dr. Carter, credibly testified that the staff was following the proper procedures with the intention of ensuring that the soldiers consuming MREs were properly protected from Salmonella and Aflatoxin and that what they had chosen to do ensured that they would be safe (tr. 1/215-218).

## V. *Mrs. Kurkjian Files a Claim*

Although Mrs. Kurkjian was told to file a voucher for the remainder of the money owed her for the base year of her contract, she did not do so (tr. 1/103-04). This failure appears to have been motivated by her concern that doing so would somehow prejudice her ability to challenge the government's failure to exercise her option or to get certain things that she wanted from the CO and upon the advice of an employment lawyer (*id.*; R4, tab 43b at 14).[18]

On December 23, 2016, Mrs. Kurkjian submitted a 137-page claim, made pursuant to the Contract Disputes Act (CDA) to the CO (R4, tabs 43a-43j). We need not delve deeply into its details to note that it includes allegations that her email was tampered with, that the government had a "deliberate and malicious plan for [her] demise" (R4, tab 43i at 131; *see also* R4, tab 43a at 2), and that she suffered emotional distress from the government's actions, including harm to her daughter, (R4, tab 43i at 133-34). It is no exaggeration to state that on almost every page of this document, Mrs. Kurkjian alleges bad faith actions by the government including making threats against her[19] and having plans to get her out of her job (R4, tabs 43a-43i). In this claim, Mrs. Kurkjian characterizes the government's failure to exercise her options as being made in bad faith and with intent to harm her (R4, tab 43i at 130), and seeks compensation for the $1,702 remaining on her contract's base year, $37,000 for each of the three option years not exercised (totaling $112,702), "Treble Punitive Damages" of $338,106, attorney fees in the amount of $4,000, and CDA interest. Among other

---

[18] In her claim submitted to the CO, she provided a number of reasons justifying why she did not submit her final invoice, generally involving the government's supposed failure to provide her assurances or take other actions to which she felt she was entitled (*see* R4, tab 43i). None of these reasons, however, explain why she should not seek to receive money to which she was entitled.

[19] We find these allegations of physical threats to be baseless.

non-monetary demands, Mrs. Kurkjian demanded that "If anything 'happens to me,'" the claim be forwarded to the Inspector General, while noting that an attorney had the file and would send "my story" to the media in such an event. (R4, tab 43i at 136)

With the exception of the $1,702 remaining on the first year of the contract, which the government had previously offered to pay her, the CO denied Mrs. Kurkjian's claim on February 1, 2017 (R4, tab 44). On March 6, 2017, the CO mailed a check in the amount of $1,702 to Mrs. Kurkjian, but she did not cash it (R4, tab 98; tr. 2/18). Shortly thereafter, she filed a timely appeal of the CO's decision to the Board.

## DECISION

The arguments presented in the argument section of Mrs. Kurkjian's brief (generally alleging violations of the duty of good faith and fair dealing and the government's hindering of her contract performance) are presented differently than the two issues she defined earlier in the brief (*compare* app. br. 4 *with* app. br. 15-30). We will address them the way they were defined in the early portion of the brief, which Mrs. Kurkjian represents as being consistent with her complaint: whether the government wrongfully terminated the base year of her contract and whether the government wrongfully failed to exercise its options on her contract (app. br. at 4). Before we rule upon the merits, we must first address what evidence to consider.

### I. *Preliminary Matters: The Government's Motion to Strike*

As alluded to in the first footnote in the Facts Section above, Mrs. Kurkjian's counsel cited her deposition in this appeal as evidentiary support for many contentions in her brief. The deposition, however, was not part of the evidentiary record, neither being submitted for inclusion in the Rule 4 file nor being offered as evidence in the hearing. The government recognized this and made a motion to strike references to the deposition in Mrs. Kurkjian's brief. We ordered Mrs. Kurkjian's counsel to file any opposition to the government's motion to strike on or before October 29, 2019. No opposition was ever filed. As explained below, we grant the government's motion to strike and will not consider factual allegations supported only by references to Mrs. Kurkjian's deposition.

In theory, perhaps, we could grant the government's motion as unopposed; nevertheless, we will provide further analysis in support of our decision. First, the deposition is not a part of the record and Mrs. Kurkjian's counsel did not even attach it to the brief. We could not review it even if we wanted to. Moreover, the Board's rules (*see* Board Rule 13(a)), amplified by our post-hearing scheduling order, makes clear that we will only consider evidence submitted in the Rule 4 file, exhibits admitted at the hearing, or the hearing transcripts. Mrs. Kurkjian's deposition does not fit into any of these categories. Finally, given Mrs. Kurkjian's availability to testify subject to cross-examination (which she did), it is highly unlikely that we would have

admitted her deposition testimony in addition to her live testimony, except as one of the usual hearsay exceptions, such as a prior consistent statement prior to a motive to fabricate.[20]  *See* Board Rule 8(b)(2).

We finally note that we have reviewed the allegations made by Mrs. Kurkjian's counsel through the precluded deposition testimony.  Such proffered evidence would not have substantially changed our conclusions regarding the government's actions and motivations in this matter.

## II. *The Government's Decision that Mrs. Kurkjian had Substantially Completed the Base Year of her Contract was not a Termination of the Contract and was Contractually Permissible*

Mrs. Kurkjian argues that the government's decision to consider her contract substantially complete and thus, confiscate her CAC card and government-issued computer was tantamount to a termination of the base year of her contract (app. br. at 3-4).  She further argues that such termination was not justified and was in bad faith both because of the reasons that drove the alleged termination and because the government had prevented her from being able to do her job, which was a breach of the duty of good faith and fair dealing.

### A. *The Base Year of the Contract was Effectively Completed*

We read the contract as requiring delivery of a set number of hours of work complying with the PWS for which the government would pay Mrs. Kurkjian $37 per hour for, on average, 20 hours a week.  It did not require completion of particular deliverables for payment.[21]  At the time that government officials told Mrs. Kurkjian

---

[20] The Board is not strictly limited to considering evidence in accordance with the Federal Rules of Evidence, but they, nevertheless, may serve as a guide.  *See* Board Rule 10(c).  Thus, in certain cases, the hearing judge may permit the parties to submit the written direct testimony of a witness, subject to cross-examination.  In those cases, however, it is well-understood by all parties and the judge prior to the hearing.

[21] This fact largely disposes of Mrs. Kurkjian's complaints that, in allegedly hindering her from completing her job and otherwise harassing her (factual assertions that we find meritless), the government breached the duty of good faith and fair dealing (*see* app. br. at 15-22).  Because she was paid for the hours that she worked, not for the documents that she produced, and there is no suggestion in the evidence before us that those hours were in any way adversely affected by any government action or inaction, it cannot be said that the government deprived Mrs. Kurkjian of the expected fruits of the contract or otherwise breached the duty of good faith and fair dealing.  *See Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,085 at 180,539; *Metcalf Constr. Co. v. United*

15

that they considered the contract complete, she had been paid (or at least invoiced, with payment coming) for all but $1,702, which works out to her having completed and having been paid about 95% of the work on the contract, which was valued at $38,110. The government also offered to pay her the $1,702 balance (and attempted to do so), which offer appears to be valid to the present day.

These facts support a finding that the government fulfilled all of its material obligations to Mrs. Kurkjian under the base year of the contract. After all, access to Natick Labs, the government-provided laptop computer, and the CAC card were all for the purpose of allowing Mrs. Kurkjian to do the work in order to get paid; they were not a thing of value, in and of themselves.

To the extent that Mrs. Kurkjian is arguing that she was somehow prejudiced because the government did not issue a "cure notice" or otherwise follow proper procedure (*see* app. br. at 27-28), this argument is a *non sequitur* since the government did not terminate her contract, much less do so for default, which is when a cure notice would be appropriate under the cases cited by Mrs. Kurkjian.

B. *Even if the Contract is Considered Terminated, Mrs. Kurkjian is Owed no More by the Government*

Even if the government were considered to have terminated the contract, and did so in bad faith (the facts support *no* finding of bad faith on the part of the government), the most that Mrs. Kurkjian would be entitled to would be lost profits, which she has been offered. First, if we were to consider this to be a constructive termination, it would nominally be considered a constructive termination for convenience. *See, e.g., Kalvar Corp., Inc. v. United States*, 543 F.2d 1298, 1306 (Ct. Cl. 1976) (constructive termination of convenience "a legal fiction which imposes the standard limitations of the termination clause upon a plaintiff even though the termination was never actually ordered by the contracting officer"). As such, the termination for convenience clause in the contract would have entitled Mrs. Kurkjian to a pro-rated payment based upon the work she had completed, plus any costs stemming from the termination, which we do not discern here. Thus, she has been paid (or at least attempted to be paid) more than she would be entitled to in a termination for convenience.

The government is only deprived of the advantages of a termination for convenience clause if the termination is done in bad faith. *See, e.g., Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996) (citing cases). In such instances, the termination is considered a breach of contract, *id*., but a breach of contract, of course, only entitles a party to damages that would make them whole for the breach, in other words, to put them in as good as a position as they would be if the

_____

States, 742 F.3d 984, 991 (Fed. Cir. 2014) (citing *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

16

other party had fully performed.  *See, e.g., Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed. Cir. 1997).  To be clear:  we do not consider there to have been a contract termination here, much less one made in bad faith.[22]  Nevertheless, in offering to pay Mrs. Kurkjian the entirety of the remaining balance on the contract, the government has attempted to make her whole since it deprived her of no profits and even acted to her slight advantage by eliminating the marginal costs of her continued contract performance.  She would thus be entitled to no further recovery.

### III. *The Government's Decision to not Exercise the Options on Mrs. Kurkjian's Contract was Contractually Permissible*

The terms of the contract do not require the government to exercise any of its options; rather, they provide that the government "may" do so.  Consequently, as a matter of law, the government is under no obligation to exercise its contract options, and its failure to do so is not actionable unless the failure is motivated by bad faith or is arbitrary and capricious.  *See Smart Way Trans. Serv.*, ASBCA No. 60315, 16-1 BCA ¶ 36,569 at 178,112 (citing *Plum Run, Inc.*, ASBCA No. 46091, *et al.*, 97-2 BCA ¶ 29,193 at 145,230); *see also Dekatron Corp. v. United States*, 128 Fed. Cl. 115, 118 (2016).  Bad faith requires intent to injure, *Smart Way*, 16-1 BCA ¶ 36,569 at 178,113, and must be proved with clear and convincing evidence.  *IMS Eng'rs-Architects, P.C.*, ASBCA No. 53471, 06-1 BCA ¶ 33,231 at 164,672-73.

Mrs. Kurkjian appears to argue that there need be no finding of bad faith to challenge the failure to exercise an option on the basis of a breach of the duty of good faith and fair dealing (*see* app. br. at 15-18).  We certainly agree with the statement of law that the breach of the duty of good faith and fair dealing does not require a finding of animus or specific targeting.  *See Lulus Ostrich Ranch*, ASBCA No. 59252 *et al.*, 19-1 BCA ¶ 37,263 at 181,342-43 (concurrence); *Metcalf*, 742 F.3d at 992-93.  Nevertheless, the law regarding the circumstances in which a contractor can challenge the government's failure to exercise an option does not fit squarely within the good faith and fair dealing cause of action, but is subject to the law quoted above,[23] and Mrs. Kurkjian has cited no law otherwise.

---

[22] As we will discuss in more detail below, the burden of proof in supporting a finding of bad faith against the government is onerous, requiring intent to injure proven by clear and convincing evidence.

[23] In *Smart Way*, we ostensibly considered the challenge to the government's failure to exercise an option as an alleged breach of the duty of good faith and fair dealing, as appellant in that case characterized it, but we applied the *Plum Run* test, which required bad faith or arbitrary and capricious conduct.  16-1 BCA ¶ 36,569 at 178,112.

In any event, Mrs. Kurkjian argues that the government's decision to not exercise her option years was driven by bad faith, both in terms of simple personal animus and such animus being motivated by her position on Salmonella and Aflatoxin testing (app. br. at 18-19; 30). She also argues that because one of the stated reasons for failure to exercise the option, fiscal uncertainty, was a pretext, the entire articulated reason was phony and cites some employment law cases in support of this allegation (app. br. at 26). Finally, she argues that alleged failures to follow agency procedures proved bad faith (app. br. at 27-29).

Mrs. Kurkjian's brief never quite crystallizes the argument implicit in this appeal, which is that she can prove bad faith or arbitrary and capricious action by demonstrating that the agency retaliated against her for her compliance with proper procedures regarding Salmonella and Aflatoxin testing. While we agree that such a motivation would be improper and call into question the government's decision-making, that is not what happened here.

As we determined above, the government decided not to exercise the options because of Mrs. Kurkjian's increasingly difficult and problematic behavior, not because of her expressed concerns about Salmonella and Aflatoxin. We are aware of the fact that many "whistleblowers" may also be perceived as difficult people (this may be what gives them the courage to come forward in the first instance), but that is not the circumstance that we are presented with. Mrs. Kurkjian's supervisors were perfectly amenable to her making efforts to comply with the appropriate testing protocols; they were not fine with unprofessional behavior that disrupted the office or her refusal to follow proper instructions. Similarly, whether correct or not, management's good faith concerns regarding Mrs. Kurkjian's personal state, accompanied as they were with good faith concerns about her well-being and desire to give her such support as could be given, undercut any suggestion that the government's actions were motivated by an intent to injure Mrs. Kurkjian.

With respect to the "pretext" of fiscal uncertainty, it is clear that the reasons for the government's decision not to exercise Mrs. Kurkjian's option were the other ones in Ms. Evangelos's memorandum, and the inclusion of that throwaway line does not detract from them, nor turn an otherwise appropriate action into something sinister. Likewise, we see no departure from procedure in the decision not to exercise the option – and certainly no facts that call into question the government's reasonable exercise of its discretion.[24] Mrs. Kurkjian has presented no clear and convincing

---

[24] As noted in the Facts section above, the Options Clause attached to the contract was not completely filled in, leaving some question about the date by which the government would need to inform Mrs. Kurkjian if it intended to exercise the option, although the government appeared to think that it needed to do so within 60 days of the expiration of the base year. This discrepancy is of no moment because it was only material if the government intended to exercise the option, not if it chose otherwise.

evidence (nor preponderant evidence, for that matter) that the government acted in bad faith and there is no evidence that its actions were arbitrary and capricious. There is no basis for her challenge of the government's failure to exercise the contract options.

CONCLUSION

For the reasons stated above, the appeal is denied.

Dated: April 23, 2020

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61154, Appeal of Catherine Kurkjian, rendered in conformance with the Board's Charter.

Dated: April 23, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals